[Civ. No. 19512.   Second Dist., Div. One.   Dec. 23, 1953.]

RAYMOND J. GAGNON et al., Respondents, v. RHODA R. ADAMSON, Appellant.

Trippet, Newcomer, Yoakum & Thomas and F. B. Yoakum, Jr., for Appellant.

Smith & Forbes, Paul R. Smith and Douglas M. Forbes for Respondents.

DRAPEAU, J.—This case presents another chapter in the turbulent legal history of the historic old Rancho Topanga Malibu Sequit. This rancho lies north and west of Santa Monica, in southern California. Originally it contained over 13,000 acres of land, and fronted 22 miles along the Pacific Ocean.

Frederick Hastings Rindge acquired the rancho in 1890. Upon his death in 1905, his widow succeeded to the ownership. She kept the rancho for many years. And she valiantly resisted every encroachment upon or over its vast domain. It was only after extended litigation that a right of way for a road along the coast was secured. (*County of Los Angeles v. Rindge Co.*, 53 Cal.App. 166 [200 P. 27].)

Title to the rancho was put in Marblehead Land Company, a family corporation. Lapse of time, the inexorable demand for land by a population increasing at incredible speed, and the business depression beginning in 1929 accomplished what Mrs. Rindge had feared and fought against for so long. In 1933 Marblehead Land Company found itself in financial difficulties, control of the corporation passed to a board of directors representing bondholders and creditors, and that alien management subdivided and sold a large part of the rancho. (Chap. 10, United States Bankruptcy Act.)

Part of the property so subdivided and sold was located in Malibu Canyon. Malibu Canyon extends northerly from the ocean beach to the precipitous Santa Monica Mountains. The beach here runs easterly and westerly. Draining the area is Malibu Creek.

As sales in the canyon progressed, parcels were conveyed by deed, with descriptions of rights of way out to the coast highway along a road on the east side of the canyon. This road has had several names: Grade Road, Homestead Road, and, more recently, Serra Road. For convenience in writing this opinion it will be called the east road.

Sales were also made along a road on the west side of Malibu Canyon. These deeds described rights of way out to the coast highway along that road. It had been and still is called Cross Creek Road. But for convenience it may be referred to as the west road.

At the upper end of Malibu Canyon where the watercourse narrows, and the more or less level land meets the precipitous hillsides, these two roads come together. Thus one may enter the east road at the Pacific Coast highway, go to the end of

that road, then around the upper end, and come back down the west road to the state highway, or go the other way round.

Projected upon a map, these two roads and their meeting at the north end of Malibu Canyon look like an elongated horseshoe, so the two roads and their curve together at the upper end have been often called ''horseshoe road.''

This case involves a right of way claimed by plaintiffs over a portion of horseshoe road where it goes through defendant's land at the head, or toe, of the horseshoe. At times that part of the horseshoe road passing through defendant's land has been referred to as the ranch road.

Defendant, Rhoda Rindge Adamson, is the daughter of Mr. and Mrs. Rindge. She purchased her property here involved from Marblehead in 1949, after plaintiffs had purchased their several parcels. Her purchase was prompted by sentiment, in some measure at least. She testified she just had to have that particular piece of land. Her father and mother lived there. In later years the rancho headquarters were there. And the place brought back to her memories of the halcyon days of the Malibu.

But Mrs. Adamson's dreams of restoring the old headquarters were rudely disturbed when she fully understood what the horseshoe right of way would do to her property. It went right through her dooryard; it cut in two the only seven acres of level land on her ranch, and it subjected her to the annoyance of a continual stream of trespassers in automobiles, raising clouds of dust and bringing hazards of fire and depredation. This was particularly serious because Mrs. Adamson paid $27,000 for the property, and spent more than $50,000 in improving it.

Now let us turn to the claims of the plaintiffs.

Marblehead commenced selling Malibu Canyon property in 1942. As sales were made to plaintiffs, or their predecessors in interest, each buyer was given in his deed a right of way to the state highway along the coast. These rights of way were either on the east or the west roads, but not on both, and not at the head of the horseshoe. Agents of Marblehead testified that one right-of-way was just tacked onto the other as the deeds were made.

But the purchasers were told by real estate salesmen for Marblehead that they would have the use of the horseshoe road for its full length, on both the east and west roads, and around the turn at the head of the horseshoe. And when they were shown the property, each of them was taken around

the horseshoe—in one way and out the other. And the road was there when government surveys were made in 1893 and in 1900; and it was well traveled when plaintiffs' properties were conveyed to them.

Mr. MacKenzie, one of the plaintiffs, testified:

"Q. Now, will you state what was said by Mr. Harrison at those conversations, said by Mr. Harrison and yourself?

"A. Well, at that time, there was water in the creek, that crossed Cross Creek Road, so I asked Mr. Harrison how we would get out of the Canyon if the creek were impassable. Mr. Harrison told me that all of the purchasers in Malibu Canyon would give a 20-foot easement so that there would be a 40-foot easement through the complete horseshoe, and that we had a right to use Cross Creek Road or Serra Road or any portions of the road. As far as we are concerned, it's all one road."

Inasmuch as one of the questions on this appeal concerns the admissibility in evidence of statements said to have been made by salesmen for Marblehead, a brief résumé of the other testimony in this respect, taken from defendant's brief, follows:

Mr. Diefenderfer, a plaintiff and also a salesman, testified that Busch (the general sales agent) and Bonsall (president of Marblehead) told him that everyone "fronting on and giving an easement useable by his neighbors" would have the right to use either road; that as properties were sold buyers could go either way through the canyon, and that he told this to Mrs. Kilgour and Cummings (predecessors of Kling and Chambers) before they purchased; that Marlow, secretary of Marblehead, told him it was Marblehead policy, as properties were sold, to reserve easements and tie in the easement granted as nearly as possible with the easement to the nearest previously sold parcel.

Plaintiff Gagnon testified that Busch's salesman, Bundy, told him that each purchaser would have to buy the road fronting his property and deed back 20 feet for the use of other owners, but he was unable to recall definitely whether he was told that he would have the right to use the horseshoe road.

Plaintiff Alexander testified that after a flood which made Cross Creek impassable he was told he would have an easement over the road to the east of his premises. Mrs. Alexander testified that she was assured by Bundy that she could go either way, as the road would be an open road throughout the canyon.

Mrs. MacKenzie confirmed Mr. MacKenzie's testimony.

The salesman from whom MacKenzie purchased testified that he told the MacKenzies that the road through the canyon was a circular drive available to everybody; initially he testified he told them they could use the road in the case of high water, but eventually he stated that he told them they could use it at any time; that the officers of Marblehead told him the road would be a circular road available to everybody, but he never mentioned this to the MacKenzies.

Plaintiff Mrs. Kilgour testified she was told that the road through Malibu Canyon would be an open road. Her husband confirmed her testimony. Mr. Smith, a salesman, testified he told Mrs. Kilgour she could ride anywhere on the canyon roads.

Mr. Cummings, predecessor of plaintiffs Kling and Chambers, testified Mr. Diefenderfer told him that the canyon road was a community road and that anyone owning property in the canyon had a right to come in or out either entrance.

When Mrs. Adamson put gates at each entrance, east and west, of the horseshoe road across her property, posted no-trespass signs, and told plaintiffs that their use of that part of the horseshoe would be by sufferance only, they brought this action. After seven days' trial, the judge found that plaintiffs were entitled to a right of way, appurtenant to their respective parcels, across defendant's property, and that at the time Marblehead conveyed to them, "use of said roadway for the benefit of plaintiffs' respective parcels of real property by said Marblehead Land Company, its grantees, and its guests, business visitors, and invitees, was open and obvious and known to said plaintiffs."

The judge further found that four of the plaintiffs had an easement over defendant's ranch road by adverse possession.

The judge further found that defendant could maintain gates across the right of way at its easterly and westerly entrances to her property, such gates not to be closed or locked, however, against plaintiffs, their successors, guests, business visitors, or invitees.

Defendant appeals from those portions of the judgment which carried into effect the findings stated.

Four grounds of appeal are urged:

1. The evidence is legally insufficient to establish an implied easement in favor of any respondent.

2. The evidence is legally insufficient to establish an easement by adverse possession in favor of respondents Gagnon, Alexander, MacKenzie and Kilgour.

3. The court erred in permitting over objection oral testimony that prospective purchasers were told that they would be entitled to use the ranch road.

4. The court erred in enjoining appellant from maintaining closed or locked gates as against respondents.

1. The law of implied easements has been exhaustively treated by our Supreme Court in two recent cases: *Owsley* v. *Hamner*, 36 Cal.2d 710 [227 P.2d 263, 24 A.L.R.2d 112], and *Fristoe* v. *Drapeau*, 35 Cal.2d 5 [215 P.2d 729]. So there is no need to add to the length of this opinion by repeating or referring to the great number of authorities there cited and discussed.

Counsel for defendant in an excellant brief point out the essentials in implied easements, and that easements by implication are not favored by law. (*Navarro* v. *Paulley*, 66 Cal.App.2d 827 [153 P.2d 397]; *Orr* v. *Kirk*, 100 Cal.App.2d 678 [224 P.2d 71].)

The brief concedes that plaintiffs and defendant all take their titles from a common source.

The brief stresses the fact that the easement was neither reasonably necessary nor for the benefit of the property for which it is claimed to be appurtenant.

To enable the reader to more quickly comprehend the rights asserted by the several parties, a rough sketch may be helpful. [See opposite page.]

It goes without saying that this is a lawyer's, not an engineer's drawing, and that, making no pretense of accuracy, it is for illustrative purposes only. Probably the most that can be said for it is that the road shown on the sketch looks more like a real horseshoe than the one on the engineers' map, which, of course, goes all the way south to the state highway.

Let us look at the sketch and take an imaginary trip up the east road and around the horseshoe, and think about the rights of the plaintiffs as we pass by their places.

Mr. Gagnon comes first. So far as ingress and egress from his property to the state highway is concerned, it is apparent that Mr. Gagnon has no need to travel the whole horseshoe.

Going further up the east road it again becomes apparent that so far as ingress and egress is concerned, neither Diefenderfer, Kling nor Chambers have any need to travel the horseshoe.

WEST ROAD

TO PACIFIC COAST
HIGHWAY

EAST ROAD

TO PACIFIC COAST
HIGHWAY

These four plaintiffs may be called those in the first class.
Going further along the horseshoe and turning west and across defendant's property, we come to Kilgour and MacKenzie. In view of the fact that it is in evidence that the west road is impassable in wet weather, it seems just as clear that Kilgour and MacKenzie have reasonable need to cross defendant's property.

Going further south, down the west road, to Mr. Alexander's property, it seems that he too would find it necessary occasionally to go back up and around the horseshoe in wet weather, to get out to the highway.

The last named three plaintiffs will be called those in the second class.

The evidence substantially supports the findings of an implied easement as to the plaintiffs in the second class.

The rights of the plaintiffs in the first class must stand upon the representations made to them when they bought their properties, and upon the fact that the horseshoe road had been and was there at the times of their several purchases. Was it the intent of all concerned that these plaintiffs should have the use of the horseshoe road as an appurtenance to their properties, whether they had reasonable use for it for ingress and egress or not?

This question has been settled in the Fristoe case, *supra* (35 Cal.2d 4). In that case it is said at page 8:

"The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances. Although the prior use made of the property is one of the circumstances to be considered, easements of access have been implied in this state in situations in which there was no prior use."

And again from the Fristoe case, quoting from the Restatement, at page 9:

" 'The extent of an easement created by implication is to be inferred from the circumstances which exist at the time of the conveyance and give rise to the implication. Among these circumstances is the use which is being made of the dominant tenement at that time. Yet it does not follow that the use authorized is to be limited to such use as was required by the dominant tenement at that time. It is to be measured rather by such uses as the parties might reasonably have expected from the future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement. It is not to be assumed, however, that they anticipated an abnormal development. Hence, the scope of an easement created by implication does not extend to uses required by such development.' (Rest., Property, § 484, comment b.)"

The evidence substantially supports the finding of the trial court that plaintiffs in the first class also have an implied right of way across defendant's land. This conclusion is supported by the fact that the trial judge viewed the premises and looked over the whole situation.

2. Having come to the conclusion that the judgment of an implied easement as to all of the plaintiffs must be sustained, it is unnecessary to give special consideration to the finding of an easement by adverse user of four of the plaintiffs.
■   A judgment will not be reversed because the findings are contrary to the evidence if different findings will still require a judgment adverse to the appellant.   (4 Cal.Jur.2d § 660, p. 543; *McCreery* v. *Wells*, 94 Cal. 485 [29 P. 877].)

The two remaining contentions of defendant may be disposed of summarily.

■   3. Inasmuch as the intent of the parties was an issue for the trial court, declarations made by agents of Marblehead were admissible in evidence. (*Fristoe* v. *Drapeau, supra.*)

■   4. So far as the gates are concerned, it would be an idle act to adjudge an easement for a right of way, and then permit the servient tenant to close that right of way with locked gates. (*Fristoe* v. *Drapeau, supra.*)   In the circumstances here present when the trial judge found the easement, he did the best he could for defendant when he permitted gates, with the direction that they were not to be closed or locked so far as plaintiffs are concerned.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied January 11, 1954, and appellant's petition for a hearing by the Supreme Court was denied February 17, 1954.