Opinion
 

 CROSKEY, Acting P. J.
 

 A.
 

 Factual and Procedural Background
 

 In 1990, Lechuza Villas West, a California limited partnership (Lechuza), purchased unimproved beachfront property in Malibu from the Adamson Company for approximately $2 million (the property). The property consists of 17 legally subdivided contiguous lots, on which Lechuza wishes to build
 
 *223
 
 Tract No. 10630, which was subdivided by the Marblehead Land Company as shown on a tract map recorded in 1932 (the 1932 Tract Map).
 
 [1]
 
 The subdivision was subject to covenants, conditions and restrictions also recorded by the Marblehead Land Company (the CC&R’s), which provided for the formation of a homeowners association, which association is now known as the Malibu-Encinal Home Owners Association (MEHOA), and which association is a party to this appeal. When Lechuza signed the purchase agreement for the property, it acknowledged that it was aware of possible limitations on development of the property, including (1) potential title claims by the State of California (the State), (2) easement claims by MEHOA, and (3) the fact that the location of the mean
 
 [2]
 
 high tide line “will have a material effect on the existence, extent, configuration and development potential of Seller’s Residential lots.”
 
 [3]
 

 In 1990 and 1991, even before it had completed its purchase of the property, Lechuza submitted several different development proposals to the California Coastal Commission (hereafter, the Coastal Commission) to obtain the necessary permits to develop the property. In connection with developing the property, Lechuza also contacted the California State Lands Commission (hereafter, the Lands Commission) about the proposed location of the residences it intended to construct. In response, the Lands Commission wrote back in March of 1991, stating, in relevant part:
 

 “Based on the information you provided and an analysis of our in-house records and maps, the proposed
 
 residences
 
 appear to be located landward of those surveyed mean high tide lines known to us at this time. Therefore, we
 
 *224
 
 will not require a lease or permit. [D You should be aware, however, that this office has not made a final determination of the State’s boundary at this location. Therefore, we reserve the right to require a lease or permit at some time in the future should it be determined State land is involved. [*]□ Our analysis of the limited evidence available of the history of the beach at this location leads us to believe that the beach sand has, at times, been washed completely down to bedrock, resulting in the loss of Sea Level Drive. The State Lands Commission will not be liable for any damage to property that may result from construction,
 
 nor does the Commission agree that it will permit any activity (for example erosion control measures) on its adjacent land, to protect structures that may be developed.
 
 ['JO
 
 This letter is not intended, nor should it be construed as, a waiver of any right, title, or interest of the State of California in any lands under its jurisdiction.”
 
 (Italics added.)
 
 [4]
 

 All these permit applications were denied, based on the Coastal Commission’s findings that the proposed development was inconsistent with various provisions of the Coastal Act, and, specifically, that the proposed revetment, which otherwise “shall be permitted when required to serve coastal-dependent uses or to protect
 
 existing
 
 structures” (Pub. Resources Code, § 30235, italics added), would interfere with the public’s right of access, could alter the usable area of beach under public ownership, cause erosion on nearby beaches, and would physically block part of the public beach and encroach on public tidelands. Lechuza filed separate mandate petitions and claims for an unconstitutional taking following the first two denials of its permit applications.
 
 [5]
 

 In 1992, following the decision in
 
 Lucas
 
 v.
 
 South Carolina Coastal Council
 
 (1992) 505 U.S. 1003 [112 S.Ct. 2886, 120 L.Ed.2d 798] (holding that the regulatory denial of all economically viable use of private property was an unconstitutional taking unless necessary to prevent a nuisance or land use prohibited by state law), the parties agreed to entry, in case No. SS001187, of a stipulated judgment for remand based on newly discovered relevant information. That stipulated judgment was entered on January 12, 1993, and provided, in relevant part, that the Coastal Commission would reconsider Lechuza’s previously denied permit applications in light of all the evidence produced at the hearing on Lechuza’s most recent (and not yet denied) permit applications.
 

 Perhaps prompted by the
 
 Lucas
 
 decision, the Coastal Commission had contacted the Lands Commission regarding the location of the mean high
 
 *225
 
 tide line at the property in question. In a letter dated November 4, 1992, the Lands Commission responded, in relevant part: “Recently, additional and more current evidence (including the studies by Uzes and Weiss referenced in your letter) has been presented to us, which indicates that the mean high tide line has been located on numerous occasions landward of the surveyed lines referenced in our earlier correspondence. The applicant’s own engineering study (Weiss) indicates that, on the average, the location of the mean high tide line would be located landward of the [developer’s] stringline and therefore within the project area several days every year. There is now a substantial indication that the State’s sovereign ownership has extended to land on which portions of the project would be located. Further study could enable a more precise determination of the extent and location of the State’s sovereign ownership in the project area. [*]Q Unless and until further study indicates otherwise, it is the position of this agency that any activity on this land will require a permit from this agency. ...[*][] Unfortunately, due to recent budget cuts and resultant staff reductions, we are unable to place high priority on defining the precise extent and location of State sovereign ownership in the Lechuza Beach area at this time. If your applicant [i.e., the developer Lechuza] wishes to pursue this matter further, he should contact [Land’s Commission’s counsel]. The applicant will be required to pay our costs in addressing the sovereign boundary issue. [TO Finally, we note that this proposed project could have a significant negative impact on the public’s right and ability to navigate and exercise the incidents of navigation in the area .... [which] are protected not only by the Coastal Act, but by the California Constitution (Article X, section 4), and numerous court decisions, fill We have been informed that the public has used this beach, including the area subject to wave uprush, for navigation and other recreational uses for many years. We therefore recommend . . . that any otherwise permissible project proposed in this area be designed so as to eliminate any potential impact on the public’s rights. To the extent any proposed project would interfere with the public’s navigational and related rights, we would object to it.”
 

 Another public hearing was held in January 1993, after which the Coastal Commission denied Lechuza’s consolidated permits, finding, among other things, that the property was subject to a public easement for navigation and that
 
 Lechuza had failed to meet its burden of showing that the project would not encroach on public tidelands.
 

 On March 15, 1993, Lechuza filed a petition for a writ of mandate and complaint for declaratory relief and damages against the Coastal
 
 *226
 
 Commission
 
 [6]
 
 (collectively, the complaint). The petition for a writ was denominated as the first cause of action of the complaint. The complaint also contained a second cause of action for declaratory relief directed at the statutory validity of the Coastal Commission’s permit decision (alleging that the Coastal Commission could not prohibit development based on Public Resources Code section 30211 unless a court of competent jurisdiction first had found that the public had acquired a right of access to the sea), a third cause of action, also for declaratory relief (alleging that the Coastal Commission could not prohibit all economically viable use of the property unless it found that the proposed uses would constitute a nuisance or that the property owner did not have sufficient rights in its property to allow for the construction of the proposed improvements), a fourth cause of action for damages for a temporary taking of property without just compensation, and a fifth cause of action for a permanent taking. As to this latter count, Lechuza sought $32 million in damages. The writ sought was one directing the Coastal Commission to set aside its denial of Lechuza’s coastal development permit applications and to issue a new decision granting such applications subject only to certain appropriate conditions.
 

 In a statement of decision dated December 27, 1994, Judge Robert H. O’Brien (Judge O’Brien),
 
 [7]
 
 in response to the Coastal Commission’s motion for an order denying Lechuza’s petition for a writ of mandate, noted that he was ruling only on the first and second causes of action because, pursuant to Superior Court of Los Angeles County Rules, local rule 2.5, he had jurisdiction only over writs of mandate and all declaratory relief actions appended thereto, and declined to rule on the third, fourth and fifth causes of action which were then before Judge Hiroshige in a different department. Judge O’Brien then concluded that the Coastal Commission could not determine whether petitioner’s project was consistent with Public Resources Code section 30211 without a proper delineation of the boundary between Lechuza’s property and the sovereign lands of the State, and that the statutory and constitutional validity of the Coastal Commission’s permit decision could not be addressed until the proper boundaries had been delineated, that the burden of establishing the location of the boundary rested on Lechuza, and that Lechuza had failed to establish the location of the boundary. Judge O’Brien rejected Lechuza’s contention that the decision in
 
 *227
 

 People
 
 v.
 
 Wm. Kent Estate Co.
 
 (1966) 242 Cal.App.2d 156 [51 Cal.Rptr. 215] (hereafter,
 
 Kent
 
 Estate) held that tidal boundaries were to be set by a fixed line, and concluded that the estimates of the mean high tide line used by Mr. Uzes, upon which the Coastal Commission relied in denying the permit, were reasonable and constituted substantial evidence supporting an ownership claim by the State to portions of the proposed project site. Given such evidence, he concluded that the Coastal Commission had not abused its discretion by denying the permit applications. Judge O’Brien also noted that the Coastal Commission’s denial of the permit applications did not definitively establish the boundary line, nor did it determine title; only a quiet title action could have such an effect.
 

 Because the unresolved status of the boundary issue justified denying Lechuza’s petition, Judge O’Brien did not reach the issue of the validity of the other findings in support of the Coastal Commission’s denial of the permit applications, nor did he reach the issue of whether the Coastal Commission could have approved the project without violating the California Environmental Quality Act, given Lechuza’s failure to perform a survey for the globose dune beetle.
 
 [8]
 
 Judge O’Brien therefore granted the motion to deny the petition, and dismissed the second cause of action. He then directed that judgment not be entered on the first and second causes of action until a decision had been reached on the third, fourth and fifth causes of action. The resolution of those claims required proceeding in a trial department as they were not the proper subject for consideration by a judge exclusively assigned to the determination of writs. Thus, the remaining causes of action were left to Judge Hiroshige for further action after Judge O’Brien ruled on the writ.
 

 On July 11, 1995, Lechuza filed a first amended petition for writ of mandate and complaint for declaratory relief, for damages and to quiet title (collectively, the amended complaint). The amended complaint added the Lands Commission as a defendant, and also added (1) a sixth cause of action for quiet title against the Lands Commission, seeking to establish that no portion of its lots which lies northerly of a line described in paragraph 64 of the amended complaint lies seaward of the ordinary high water mark of the Pacific Ocean; (2) a seventh cause of action for quiet title against the Lands Commission, seeking to establish that no public right of navigation exists landward of the ordinary high water mark of the Pacific Ocean upon any portion of Lechuza’s lots; and (3) an eighth cause of action for quiet title against the State, seeking to establish that no easement for public recreational use exists with respect to any portion of Lechuza’s lots lying northerly of the lines described in paragraph 64 of the amended complaint.
 

 On August 16, 1995, Lechuza again amended its complaint to substitute MEHOA as a defendant in place of one of the Doe defendants, and the
 
 *228
 
 parties stipulated that the action could be coordinated with Malibu-Encinal Home Owners Association v. Adamson Companies (Super. Ct. L.A. County, No. WEC 145642), a then pending action by MEHOA against Lechuza to establish private prescriptive rights in the property on behalf of itself and its members. The parties then stipulated that the various issues raised by the coordinated cases would be tried as follows: First, all of the quiet title issues, except for MEHOA’s prescriptive easement claim, would be tried. Second, using the boundary determination made in the quiet title trial, MEHOA’s prescriptive easement claim would be tried. Third, the takings claims would then be tried.
 

 MEHOA then filed a cross-complaint against Lechuza, and various other defendants, which contained three causes of action: (1) to quiet its title to an express easement over Lechuza’s lots; (2) for a declaration as to the size and location of such express easement for access and recreation over Lechuza’s lots; and (3) for a declaration as to MEHOA’s rights, under the CC&R’s, to interpret and enforce the CC&R’s against Lechuza’s lots (MEHOA’s third cause of action). The above mentioned stipulation as to the order in which the various causes of action would be tried made no mention of MEHOA’s third cause of action and how or when it would be tried.
 
 [9]
 

 Following trial, Judge Hiroshige issued a statement of decision resolving three related issues: (1) the location of the seaward boundary, (2) the claim of the State for a public navigational servitude over those portions of the property covered from time to time by the ebb and flow of the ocean tide, and (3) MEHOA’s claim of an
 
 express
 
 easement pursuant to the CC&R’s. As to the boundary issue, Judge Hiroshige concluded that
 
 Kent Estate
 
 had held that “on beaches subject to a fluctuating mean high tide line due to annual erosion and accretion, ... the ordinary high water mark will constitute an ‘average’ fixed location of the mean high tide line which then serves as the seaward boundary between private property and public tidelands.”
 
 [10]
 

 As to the remaining two issues, Judge Hiroshige concluded that (1) the State had no claim to a navigational easement landward of the now established seaward boundary up to the point at which the highest annual swells
 
 *229
 
 might reach, relying on
 
 Aptos Seascape Corp.
 
 v.
 
 County of Santa Cruz
 
 (1982) 138 Cal.App.3d 484 [188 Cal.Rptr. 191], and the State also had failed to prove that there had been any implied dedication of an easement for recreational use over the property under the doctrine enunciated in
 
 Gion
 
 v.
 
 City of Santa Cruz
 
 (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50], and (2) MEHOA’s express easement was to be measured 25 feet landward from the seaward boundary of the property as now established by the statement of decision. Judge Hiroshige then added, although the only issue as to MEHOA which was to have been tried in the quiet title action was MEHOA’s rights as to the express easement, that “MEHOA has failed to meet its burden of proof
 
 as to all other claims set forth in MEHOA’s Cross-Complaint.”
 
 (Italics added.)
 

 Based on this statement of decision, filed on June 11, 1996, Judge Hiroshige entered judgment as to Lechuza’s sixth, seventh and eighth causes of action, as to all the causes of action in the cross-complaint filed by the State and the Lands Commission (i.e., a partial, and hence nonappealable judgment as between Lechuza and the State and the Lands Commission), and as to all causes of action in MEHOA’s cross-complaint (i.e., a final, and hence appealable, judgment as to MEHOA) (hereinafter, the June 11, 1996, judgment).
 

 The Lands Commission and MEHOA filed notices of appeal from the June 11, 1996, judgment. Lechuza filed a notice of cross-appeal with respect to the establishment of a seaward boundary at a location other than that depicted on a recorded 1932 Tract Map of the property, and as to the determination that MEHOA’s express easement is located 25 feet landward of the boundary as established by the judgment. Lechuza also filed a “supplemental” notice of cross-appeal as to Judge O’Brien’s original denial of its petition for a writ of mandate.
 

 After trial of the quiet title action, the Coastal Commission moved for summary judgment on the ground that the takings claims were not ripe for judicial determination because Lechuza’s project impermissibly encroached on MEHOA’s express easement as established by Judge Hiroshige’s determination of the fixed seaward boundary, and therefore the project needed to be redesigned and resubmitted. The Coastal Commission also moved for judgment on the pleadings on the ground that Lechuza had failed to meet the reapplication requirement of the ripeness doctrine because the denial of the project was not a final determination in the absence of a showing that Lechuza had sought permits for a revised project after the denial of its application. Lechuza, too, filed a motion for summary adjudication on the Coastal Commission’s liability for a taking, which was opposed by the Coastal Commission on the ground that there were triable issues of material fact as well as on various legal grounds.
 

 
 *230
 
 Judge Hiroshige granted Lechuza’s motion for summary adjudication on liability for a temporary taking, based on his conclusion that the Coastal Commission had improperly relied on an ambulatory seaward boundary line, and on his determination that the other bases upon which the Coastal Commission had denied the permit applications, e.g., threats to public access posed by the revetment and geologic hazards inherent in the bluff-face location, were “purported legitimate!] state interests [which] have been rejected by
 
 Lucas.”
 
 Judge Hiroshige denied Lechuza’s motion for summary judgment on the permanent taking issue, concluding that Lechuza must first resolve MEHOA’s easement claims, and that such claim was not ripe because the project would need to be redesigned to avoid encroachment on MEHOA’s express easement. The issue of damages for the temporary taking claim was set for trial at a later date.
 

 Lechuza then filed a motion for remand to the Coastal Commission pursuant to Code of Civil Procedure section 1094.5, subdivision (e). This motion was directed to Judge Hiroshige, rather than Judge O’Brien, on the ground that Judge Hiroshige’s boundary determination and summary judgment on the temporary taking issue constituted new evidence within the meaning of Code of Civil Procedure section 1094.5, subdivision (f), thus allowing remand to the Coastal Commission. Over the Coastal Commission’s objections, Judge Hiroshige granted the motion for remand, entered a partial judgment on Lechuza’s petition for a writ of mandamus, and issued a peremptory writ of mandate directing the Coastal Commission to set aside its denial of Lechuza’s permit applications based on Judge Hiroshige’s “relevant rulings.” Judge Hiroshige also ordered the Coastal Commission to reconsider the permit applications at the Coastal Commission’s next meeting.
 

 The Coastal Commission refused to follow such directions and, instead, conducted a closed litigation session to consider the peremptory writ, and then announced it had authorized the Attorney General to file an appeal. Judge Hiroshige granted Lechuza’s subsequent ex parte application that the appeal not operate as a stay of execution of the partial judgment, and that the peremptory writ remain in full force and effect, except that he amended the writ to require the Coastal Commission to reconsider the permit applications at its
 
 next
 
 meeting. The Coastal Commission appealed both the June 11, 1996, judgment and the lifting of the automatic stay, and petitioned this court for a writ of mandate to stay the pending trial on damages for the temporary taking and the requirement that it hear the remanded permit applications at its next meeting. We issued a writ of supersedeas, consolidated the quiet title, takings and mandate appeals with the appellate mandate proceeding, and expedited them for review.
 

 Because the State’s, the Coastal Commission’s, and the Lands Commissions’ purported appeals are from the June 11, 1996, nonappealable “partial
 
 *231
 
 judgment” (see
 
 Morehart
 
 v.
 
 County of Santa Barbara
 
 (1994) 7 Cal.4th 725, 743-744 [29 Cal.Rptr.2d 804, 872 P.2d 143]), we treat them as petitions for extraordinary relief, given that the case in its present posture presents unusual circumstances making it appropriate to ascertain from the record whether there are substantive errors that we should, by writ, order the trial court to correct. Judicial economy would not be served in this case by deferring resolution of the issues decided by Judge Hiroshige until final judgment on all of Lechuza’s causes of action, particularly given (1) Judge Hiroshige’s decision sending the matter back to the Coastal Commission for reconsideration of Lechuza’s permit applications based on his decision in the quiet title action before the quiet title decision was final, and (2) the extensive briefing of the relevant issues not only by the parties, but also by amicus curiae who seek clarification of an area of law with a potential effect on significant areas of California land. Further proceedings in the trial court would be unlikely to improve upon the record or briefing now presented to us for resolving the questions raised by this case. In addition, the continuing public interest in the present issue and its likely recurrence is another unusual circumstance indicating that we should resolve the issue here.
 
 (Id.
 
 at pp. 744-746.)
 

 Because the June 11, 1996, judgment is actually a final judgment as between MEHOA and Lechuza that resolves all issues between those parties, MEHOA’s appeal from the June 11, 1996, judgment is, in fact, a proper appeal.
 

 B.
 

 Contentions on Appeal
 

 The Coastal Commission contends: (1) Judge Hiroshige erred by granting Lechuza’s motion to remand under Code of Civil Procedure section 1094.5, subdivision (e), because Judge O’Brien had already adjudicated the mandate petition and any attempt to reconsider Judge O’Brien’s decision should have been directed to Judge O’Brien; (2) the partial judgment should be reversed because it is premised on an erroneous determination that the Coastal Commission misapplied coastal boundary law; (3) the partial judgment should be reversed because it is premised on the erroneous determination that the Coastal Commission engaged in a taking, and the order granting summary adjudication on the issue of taking liability should be vacated; (4) even if Judge Hiroshige did not err in determining the location of the seaward boundary, the order granting summary adjudication on the issue of taking liability should be vacated because: (a) Judge Hiroshige’s finding that the Coastal Commission erred in denying the permit application required him to overrule Judge O’Brien’s decision upholding the Coastal Commission’s decision to deny the permit applications; or (b) Lechuza’s taking
 
 *232
 
 claim was not ripe because the Coastal Commission had not yet reviewed the permit applications in light of the judicially established seaward boundary; or (c) Lechuza’s taking claim was not ripe because its project encroached on MEHOA’s express easement and the Coastal Commission could not render a final decision until Lechuza redesigned its plans to avoid such encroachment; or (d) in the absence of the submission of a less intrusive project, there was no basis for concluding that the permit denial was the Coastal Commission’s final and authoritative determination of the type and intensity of development legally permitted on the property; (5) Lechuza’s motion for summary adjudication should have been denied because there were numerous triable issues of material fact and because the evidence offered in support of the motion was defective; and (6) the Coastal Commission’s appeal of the trial court’s order suspending the automatic stay under Code of Civil Procedure section 1110b should be dismissed as moot.
 

 The Lands Commission contends: (1) Judge Hiroshige erred by concluding that the southerly boundary line is fixed rather than ambulatory; (2) even if
 
 Kent Estate
 
 had precedential value for the proposition that a fixed boundary line between the ocean and the shore is proper, the use of a fixed, average line would not be proper under the circumstances of this case; (3) the public has navigational and recreational rights that follow the ocean’s navigable waters, which waters, and concomitant rights, routinely extend past the ordinary high tide line and the fee ownership line of Lechuza Beach, and therefore Judge Hiroshige erred by concluding that Lechuza’s property was not subject to such public navigational and recreational rights; and (4) Judge Hiroshige abused his discretion by denying the Lands Commission’s motion for a new trial and imposing sanctions on the Lands Commission for bringing the motion for a new trial.
 

 MEHOA contends: (1) if the partial judgment is reversed because the boundary line was improperly determined, then the judgment between MEHOA and Lechuza establishing the location of the easement also must be modified accordingly; (2) the award of attorney fees to Lechuza and against MEHOA pursuant to Civil Code section 1354 was error because Lechuza was not the prevailing party; (3) Judge Hiroshige erred by vacating ME-HOA’s voluntary dismissal of its third cause of action (for a declaration that the CC&R’s applicable to it and its members also applied to Lechuza’s property, and that MEHOA and its architectural committee have the right and power to interpret and enforce the CC&R’s) and by awarding sanctions against MEHOA for dismissing such cause of action; (4) Judge Hiroshige abused his discretion by awarding sanctions against MEHOA; and (5) Judge Hiroshige erred by denying MEHOA’s motion to strike Lechuza’s cost bill as untimely.
 

 Lechuza disputes each of these contentions. In addition, as cross-appellant, Lechuza contends that (1) the recorded 1932 Tract Map delineates the
 
 *233
 
 legal boundaries of the property and/or that alternatively, the seaward line shown on that map constitutes an agreed-upon boundary line and hence the legal boundary line; and (2) there is no public easement landward of the seaward boundary line as to any land over which tidal waters may extend from time to time.
 
 [11]
 
 The State, acting by and through the Lands Commission, disputes Lechuza’s contention that the boundary was permanently fixed by the 1932 Tract Map or by agreement.
 

 C.
 

 Discussion
 

 1.
 
 Judge Hiroshige Erred by Granting Lechuza.’s Motion to Remand Pursuant to Code of Civil Procedure Section 1094.5, Subdivision (e)
 

 The Coastal Commission contends that Judge Hiroshige erred by issuing a peremptory writ of mandate directing the Coastal Commission to reconsider Lechuza’s permit applications based on Judge Hiroshige’s conclusion as to the location of the legal southerly boundary because (1) Code of Civil Procedure section 1094.5 does not allow him to reopen the mandate proceedings that already had been concluded by Judge O’Brien, and (2) Judge Hiroshige had no jurisdiction to overrule Judge O’Brien’s decision to deny the petition for a writ of mandate. Lechuza contends that Judge Hiroshige’s actions were appropriate, citing
 
 Windigo Mills
 
 v.
 
 Unemployment Ins. Appeals Bd.
 
 (1979) 92 Cal.App.3d 586 [155 Cal.Rptr. 63],
 
 Curtis
 
 v.
 
 Board of Retirement
 
 (1986) 177 Cal.App.3d 293 [223 Cal.Rptr. 123], and
 
 Toyota of Visalia, Inc.
 
 v.
 
 New Motor Vehicle Bd.
 
 (1987) 188 Cal.App.3d 872 [233 Cal.Rptr. 708].
 

 Code of Civil Procedure section 1094.5 provides for judicial review of administrative orders or decisions. (Code Civ. Proc., § 1094.5, subd. (a).) The scope of such review is “whether the [administrative agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.” (Code Civ. Proc., § 1094.5, subd. (b).) Abuse of discretion is established if the administrative agency has not proceeded in the manner required by law, the order
 
 *234
 
 or decision is not supported by the findings, or the findings are not supported by the evidence.
 
 {Ibid.)
 
 It was pursuant to this section that Lechuza sought review of the Coastal Commission’s denial of its permit applications, and pursuant to which section Judge O’Brien reviewed the Coastal Commission’s denial of the permit applications and denied Lechuza’s petition for a writ of administrative mandamus, having concluded that the Coastal Commission had not abused its discretion by denying the permit applications.
 

 Code of Civil Procedure section 1094.5, subdivision (e), the subdivision pursuant to which Judge Hiroshige issued a peremptory writ of mandate commanding the Coastal Commission to set aside its permit denial and to reconsider Lechuza’s permit applications based on “the relevant rulings of the Court in this action,” provides: “Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced [new evidence] or which was improperly excluded at the hearing before [the administrative agency], it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case.”
 
 [12]
 

 Here, Judge Hiroshige remanded the matter to the Coastal Commission for reconsideration based on the “new evidence” of the now legally determined seaward boundary. However, this was not newly discovered evidence which, in the exercise of reasonable discretion, could not have been produced or which was improperly excluded at the hearing before the Coastal Commission. As the Coastal Commission and the Lands Commission point out, there was no reason that Lechuza could not have established the legal boundary of the property before it proceeded with any of its multiple permit applications. Therefore, there was no legal basis upon which the matter could be remanded for reconsideration; instead, Lechuza’s proper remedy would have been to resubmit permit applications based on the legally established boundary. However, as the nature of the extant proceeding shows, such a resubmission (not to mention a writ commanding reconsideration) would have been premature until the judicial decision as to the legal boundary became final.
 

 This resolves the takings issue as well. Although Judge Hiroshige found that there had been a temporary taking of Lechuza’s property, there can be
 
 *235
 
 no
 
 taking,
 
 temporary or permanent, until there is a final governmental determination which deprives the property owner of all or substantially all economic use of his or her property.
 
 (Kavanau
 
 v.
 
 Santa Monica Rent Control Bd.
 
 (1997) 16 Cal.4th 761, 773-774 [66 Cal.Rptr.2d 672, 941 P.2d 851];
 
 Twain Harte Associates, Ltd.
 
 v.
 
 County of Tuolumne
 
 (1990) 217 Cal.App.3d 71, 88-89 [265 Cal.Rptr. 737].) There has been no such final determination here. In
 
 Lucas,
 
 the Supreme Court held that a regulation which denied a coastal owner the right to any construction on or other beneficial use of its property would constitute a compensable taking if, under state law, a right to develop the land existed prior to enactment of the challenged regulation. Here, Lechuza did not establish that it had such a right to develop “its” property as requested in its permit applications, given that it had not established the location of the legal boundary and of MEHOA’s express easement.
 

 2.
 
 The Legal Boundary Line Is Ambulatory, Not Fixed
 

 Both the Coastal Commission and the Lands Commission contend that Judge Hiroshige erred by determining that the boundary line between Lechuza’s property and that of the State is a fixed line based on the mathematical average of 37 surveys of the mean high tide line. They argue that instead the proper boundary between the State’s tidelands and Lechuza’s private property is a line which moves as the ordinary high tide (a fixed plane) intersects the shifting sands from day to day.
 

 Tidelands are those lands lying between the lines of mean high and mean low tide which are covered and uncovered successively by the ebb and flow thereof.
 
 (Marks
 
 v.
 
 Whitney
 
 (1971) 6 Cal.3d 251, 257-258 [98 Cal.Rptr. 790, 491 P.2d 374].) The State owns all tidelands below the ordinary high water mark, and holds such lands in trust for the public (Civ. Code, § 670;
 
 State of Cal.
 
 ex rel.
 
 State Lands Com.
 
 v.
 
 Superior Court
 
 (1995) 11 Cal.4th 50, 63 [44 Cal.Rptr.2d 399, 900 P.2d 648]), while the owners of land bordering on tidelands take to the ordinary high water mark. (Civ. Code, § 830;
 
 State of Cal.
 
 ex rel.
 
 State Lands Com.
 
 v.
 
 Superior Court, supra,
 
 11 Cal.4th at p. 63.) The high water mark is the mark made by the fixed plane of high tide where it touches the land; as the land along a body of water gradually builds up or erodes, the ordinary high water mark necessarily moves, and thus the mark or line of mean high tide, i.e., the legal boundary, also moves.
 
 (City of Oakland
 
 v.
 
 Buteau
 
 (1919) 180 Cal. 83 [179 P. 170];
 
 Kent Estate, supra,
 
 242 Cal.App.2d at p. 160.)
 
 [13]
 

 In
 
 Kent Estate, supra,
 
 242 Cal.App.2d 156, on the interpretation of which Judge Hiroshige and Judge O’Brien parted company, the defendant owned a
 
 *236
 
 sandspit bounded on one side by the Pacific Ocean and on the other side by a lagoon. The State owned the submerged lands. After a State survey, the defendant brought a quiet title action, and a decree was entered in 1950. The defendant subdivided the land and sold some lots. It also drove a line of iron stakes, several feet apart, into the sand at a right angle with the sea, thus forming a fence, and posted “no trespassing” signs. The State contended that the fence extended into State property and constituted a public nuisance, and sued for injunctive relief
 
 (not
 
 quiet title).
 

 The evidence presented showed that the mean high tide could be established by visual reference to a monument or bench mark of the United States Coast and Geodetic Survey. There was also evidence that the sand built up seaward during the summer months, thus increasing the beach area, and that the sand was washed away during the winter months, thus decreasing the beach area. The movement of the sand could account for an annual variation of as much as 80 feet in the point at which the water, at ordinary high tide, touched the shore line.
 

 The trial court enjoined the defendant from interfering with the public’s use of the land lying seaward of the ordinary high water mark, but declined to fix the location of such mark. It termed the boundary between the defendant’s and the State’s lands to be the “ ‘ordinary high water mark of the Pacific Ocean as it may fluctuate naturally from time to time.’ ” The trial court also found that the defendant’s fence “ ‘extends or may extend from time to time seaward of [the] ordinary high water mark,’ ” and that “ ‘from time to time, the ordinary high water mark . . . migrates landward due to natural erosion and seaward due to natural accretion.’ ” (242 Cal.App.2d at p. 158.)
 

 
 *237
 
 The defendant appealed, and the First District Court of Appeal reversed. The reviewing court first rejected the defendant’s argument that the 1950 decree established the then state survey line as the fixed seaward boundary, noting that the decree, as to the seaward boundary, made no reference to the state survey, in contrast to the decree’s reference to the lagoonward boundary as being the “ Tow water mark in [the lagoon], as fixed by the . . . State survey.’ ” (242 Cal.App.2d at p. 159.) It then held that the trial court’s determination of the seaward boundary was too uncertain to be enforced, noting that some of the uncertainty stemmed from the trial court’s view that the ordinary high water mark is itself a fluctuating, variable or migrating line.
 
 (Ibid.)
 
 According to the reviewing court, ordinary high tide is determined by averaging high tides over a period of 18.6 years. This average represents the height or elevation of a plane of water, which, once determined, becomes a fixed figure, readily ascertainable by reference to monuments and tidal data of the United States Coast and Geodetic Survey. Thus, to the extent that the
 
 Kent Estate
 
 trial court’s findings, conclusions, and judgment implied that ordinary high tide is a variable plane, they were in error.
 
 (Id.
 
 at p. 160.)
 
 [14]
 

 The
 
 Kent Estate
 
 court then made a distinction between the ordinary high tide (an unvarying plane) on the one hand, and, on the other hand, the boundary line created at the point at which the plane of average high tide meets the land, which line
 
 may
 
 vary: “To the extent that the land itself moves, as is the case of the sandy beach here in issue, this line does vary.” (242 Cal.App.2d at p. 160.) It then concluded that the evidence before the trial court did not support the trial court’s finding that the boundary in this case actually migrated back and forth between the land and sea due to natural erosion (more properly termed deliction) and accretion, given that according to case law, only gradual, “imperceptible” changes in land mass constitute accretion and/or deliction, and the evidence showed a change of some 80 feet between the summer and winter months—“hardly . . . gradual and imperceptible” changes, which thus could not “meet the definitions of natural accretion and deliction.”
 
 (Ibid.)
 

 Having concluded the evidence did not support the trial court’s finding that there was natural accretion and/or deliction (upon which finding rested the trial court’s conclusion that the boundary line migrated from time to time), the court then considered what might be accomplished upon retrial. Noting that “the ‘almost mathematical line bounding Blackacre’ [citation]
 
 *238
 
 cannot be achieved, but somewhat greater certainty should be possible than the constantly moving line contemplated by the present decree,” and that “[i]f not, [then] the trial court should consider whether the uncertainty is so great as to warrant denial of injunctive relief [citation],” the reviewing court suggested that upon retrial the parties should determine whether the change in land mass was substantially the same each year, which would “thus afford[] a basis for fixing an average, mean, or ordinary line of the shore against which the average plane of the water at high tide may be placed to determine a reasonably definite boundary line.” (242 Cal.App.2d at p. 161.)
 

 Thus, the
 
 Kent Estate
 
 court did
 
 not
 
 hold that the boundary line created by the points at which the plane of the average high tide meets the land cannot vary.
 
 Instead, it specifically recognized that such a boundary line may vary to the extent the latid itself moves. It
 
 also suggested that a fluctuating boundary line might warrant denial of injunctive relief, and
 
 suggested, without so holding,
 
 that one way to create some certainty as to a boundary might be to calculate an average or ordinary line of the shore against which the plane of the ordinary high tide could be placed to create a reasonably definite boundary line.
 

 The principle relied upon by the reviewing court in
 
 Kent Estate, supra,
 
 242 Cal.App.2d 156, that a coastal boundary line may move back and forth with erosion and accretion, is thus in keeping with the earlier authority of
 
 City of Oakland
 
 v.
 
 Buteau, supra,
 
 180 Cal. 83. In that case, the City of Oakland had obtained a judgment condemning for public use certain property held in trust for Merritt Hospital to the extent such property lay above the line of “ship channel.”
 
 [15]
 
 Part of the property condemned was above the line of low tide, and part was below the low tide line. Thereafter, the city brought suit to recover possession of the land lying below “ship channel,” which the hospital used for wharflng purposes. In
 
 Oakland
 
 v.
 
 Oakland Water Front Co.
 
 (1897) 118 Cal. 160 [50 P. 277], the California Supreme Court had held that “ship channel,” as used in the act of May 4, 1852, meant the low tide line, and the city and the hospital both agreed that the issue therefore was the location of the boundary at the low tide line. However, the city took the position that the southerly boundary of the property was the line of low tide as it existed on May 4, 1852, while the hospital took the position that the boundary described in the act was the line of low tide as it might appear from time to time.
 

 The California Supreme Court held that both as to lands bordered by streams, i.e., riparian lands, and lands bounded by tidal water, i.e., littoral
 
 *239
 
 lands, it was “unquestioned law” that
 
 “a boundary marked by a water line is a shifting boundary, going landward with erosion and waterward with accretion." (City of Oakland
 
 v.
 
 Buteau, supra,
 
 180 Cal. at p. 87, italics added.) The court considered the practical problems involved in a shifting boundary line, noting, “To the suggestion that a boundary shifting with the location of the tide line would be incapable of definite ascertainment, we respond that in our judgment such a line is more readily susceptible of location on the ground than a line not marked by permanent monuments, and to be determined by conditions as they existed many years ago.” It then concluded that the southerly boundary of the land formerly owned by the hospital was the “low tide line
 
 as it might exist from time to time,"
 
 and that the city, as the party seeking possession of the land, either was required to show affirmatively that the low tide line as of the time it instituted the condemnation suit was at or north of the northerly boundary of the property described in its complaint or to acquire by condemnation or purchase the land between the low tide line of May 4, 1852, and the low tide line of the date of such acquisition.
 
 (Id.
 
 at pp. 90-91, italics added.)
 
 [16]
 

 As noted above, Lechuza took a cross-appeal from Judge Hiroshige’s determination that the seaward boundary is located anywhere other than at the location depicted on the recorded 1932 Tract Map for tract No. 10630. In other words, Lechuza’s fallback position is that even though a boundary along the ocean
 
 legally may
 
 be ambulatory rather than fixed, the particular boundary here
 
 was
 
 fixed. According to Lechuza, the recorded 1932 Tract Map delineates the legal boundaries of the property as the line of mean high tide as surveyed on July 23, 1932, and the government’s acceptance and recordation of the 1932 Tract Map pursuant to the guidelines set forth in the
 
 *240
 
 Subdivision Map Act has conclusively established the boundaries of the subject property. As to the first of these points, Lechuza cites no authority for the proposition that the reference on a tract map to the mean high tide as surveyed
 
 on a particular date
 
 in and of itself establishes such otherwise undefined line as the legal boundary thenceforth, regardless of how the mean high tide or shoreline’s profile may vary over the years. Its lack of citation to any authority is not surprising, as explained below.
 

 First, the general rule is that a line shown on a map which runs along the edge of the ocean is a meander line, used to ascertain the quantity of land subject to sale and to show the sinuosities of the shore, and that the high tide line, not the meander line, is the true legal boundary.
 
 (Los Angeles
 
 v.
 
 San Pedro etc. R. R. Co.
 
 (1920) 182 Cal. 652, 654-655 [189 P. 449];
 
 Aptos Seascape Corp.
 
 v.
 
 County of Santa Cruz, supra,
 
 138 Cal.App.3d at pp. 504-505.)
 

 Second, in a deed, as in any contract, a court must attempt to ascertain the intent of the parties by first looking to the language in the deed, as construed in light of any extrinsic evidence which may prove a meaning to which the language of the instrument is reasonably susceptible.
 
 (City of Manhattan Beach
 
 v.
 
 Superior Court
 
 (1996) 13 Cal.4th 232, 238 [52 Cal.Rptr.2d 82, 914 P.2d 160];
 
 Continental Baking Co.
 
 v.
 
 Katz
 
 (1968) 68 Cal.2d 512, 521 [67 Cal.Rptr. 761, 439 P.2d 889];
 
 City and County of San Francisco
 
 v.
 
 Union Pacific R.R. Co.
 
 (1996) 50 Cal.App.4th 987, 994 [58 Cal.Rptr.2d 1].) Here, while the parties do not point to the deeds by which Marblehead Land Company conveyed title to the lots, they do refer to the recorded CC&R’s, which, by their terms, applied to “[a]U real property contained within the exterior boundary lines of Tract No. 10630.” The CC&R’s identify an easement for access and recreation on the beach (i.e., the express easement claimed by MEHOA over Lechuza’s property, i.e., lots 141 through 159) as follows: “28. Lots 124 to 139, inclusive, and Lots 141 to 159, inclusive, shall be subject to an easement, and said easement is hereby reserved, in favor of Grantor, its successors in interest and assigns, each and every home owner in said Tract No. 10630, . . . Said easement shall be used for pedestrian travel, bathing and recreational purposes, and all purposes incidental thereto, and not for other purposes and not for the purposes of camping, erecting tents, or buildings, landing or launching boats, or maintaining concessions or lighting fires. ... On Lots 141 to 159, inclusive, said easement shall include the southerly twenty-five (25’) feet of each and all aforesaid lots, being a strip of land twenty-five feet (25’) in width, lying within said Lots 141 to 159, inclusive, and bounded on the south by the southerly lines of said lots, on the east by the easterly line of Lot 141, and on the west by the westerly line of Lot 159, as
 
 such lines are delineated on the recorded map and/or maps herein referred to, and also all land that may now or hereafter be located between said lots and the ordinary
 
 
 *241
 

 high water mark of the Pacific Ocean, except where said northerly line of said easement shall be at an elevation greater than five feet (5’) above said ordinary high water mark line, in which event said five foot elevation line above said ordinary high water mark shall become the northerly line of said easement; provided, however, in no event shall said easement be less than ten feet (10’) inland from said ordinary high water line.”
 

 Applying the above noted rule of interpretation to the CC&R’s, along with the general rule that a boundary along the edge of a body of water follows the water line itself, we conclude that the only reasonable interpretation of the line shown on the 1932 Tract Map is that the Marblehead Land Company intended that the southerly boundary of the lots in question was to be defined by the mean tide line
 
 as it might exist from time to time,
 
 not by a static line defined by the mean high tide line as it existed as surveyed on July 23,1932, and that the fact the meander line showed that it was based on a survey of a particular date was irrelevant on the issue of the legal southerly boundary.
 

 Having so concluded, Lechuza’s second proposition, that the government’s acceptance and recordation of the 1932 Tract Map pursuant to the guidelines set forth in the Subdivision Map Act has conclusively established the boundaries of the subject property, also is irrelevant; if true, it merely leads to a conclusion that the boundary so established is one which moves with the intersection of the plane of ordinary high tide and the shore.
 
 [17]
 

 
 *242
 
 Lechuza implies that there is such an inherent problem with a moving boundary line that some special onus lies on us to clarify or provide practical direction to the trial court as to how to “quiet title to a moving boundary.” Title is not quieted as to boundaries, moving or otherwise; it is quieted as to legal interests in property. “Such an action is brought, as authorized by the statute, ‘for the purpose of determining’ any adverse claim that may be asserted therein by a defendant to the land in controversy; and this does not mean that the court is simply to ascertain, as against a plaintiff shown to have a legal interest, whether or not such defendant has some interest, but also that the court shall declare and define the interest held by the defendant, if any, so that the plaintiff may have a decree finally adjudicating the extent of his own interest in the property in controversy. The object of the action is to finally settle and determine, as between the parties, all conflicting claims to the property in controversy, and to decree to each such interest or estate therein as he may be entitled to. Of course, if the plaintiff fails to show any legal interest in the property in controversy, and as to which he asserts title, he must fail altogether, and could not complain of a judgment of nonsuit, but where he shows any legal interest, he is entitled to have that interest declared by the court. [Citations.]”
 
 (Peterson
 
 v.
 
 Gibbs
 
 (1905) 147 Cal. 1, 5 [81 P. 121].)
 

 In our disposition of this appeal, we have directed the trial court that any judgment in Lechuza’s quiet title action must make it clear that the southerly boundary line between Lechuza’s property and the public tidelands is an ambulatory line which moves as described in the opinion, i.e., that the legal boundary line between the shoreline and the ocean is the line where the plane of the ordinary or mean high tide meets the shifting sand from time to time. “ ‘[T]he rule is that the
 
 description
 
 in a judgment affecting real property should be certain and specific, and that an impossible, wrong, or uncertain description, or no description at all, renders the judgment erroneous and void.’
 
 (Newport
 
 v.
 
 Hatton
 
 [(1924)] 195 Cal. 132, 156 [231 P. 987, 996].)”
 
 (Newman
 
 v.
 
 Cornelius
 
 (1970) 3 Cal.App.3d 279, 284 [83 Cal.Rptr. 435], italics added.) A description of the southerly boundary as an ambulatory line where the plane of ordinary or mean high tide meets the shifting sand from time to time is certain and specific, not impossible, wrong
 
 *243
 
 or uncertain. The fact that the boundary line itself may move does not mean that the
 
 description
 
 of the boundary, too, is changeable.
 

 A description of the parties’ legal interests in real property is all that can be expected of a judgment in an action to quiet title. The other problems faced by Lechuza, e.g., whether to risk building on land it has legal title to today but which may become tidelands as a result of natural forces, are not properly resolvable in such an action. It is clear that Lechuza’s desired outcome has been not to have legal title declared as it really is, which is the effect of a successful action to quiet title, but instead to obtain a judgment changing the title to some portion of the property, i.e., to vest in itself permanent legal title over land which, because it is bordered by the ocean and is subject to seasonal accretion and erosion, belongs sometimes to the state and sometimes to Lechuza. This cannot be done by an action to quiet title. (See
 
 Harrigan
 
 v.
 
 Mowry
 
 (1890) 84 Cal. 456, 458-459.)
 

 3.
 
 Judge Hiroshige Did Not Err When He Concluded That the Public Has No Recreational Rights Over Lechuza’s Privately Owned Property Based on a Theory That the Water Which Occasionally Flows Inland Over the Legal Boundary Is “Navigable Water”
 

 The Lands Commission contends that Judge Hiroshige erred by concluding that the public has no recreational rights in the ocean waters which extend over Lechuza’s privately owned property, i.e., that the public has no right to walk in the water which flows above the line where the plane of ordinary high tide intersects the shore.
 

 At trial, the Lands Commission presented evidence that because the plane of the ordinary high tide consists of an average of the high tide elevations, approximately 14 percent of the time the high tide will flow past the legal boundary line where the plane of ordinary high tide intersects the shore. According to the Lands Commission, the public’s rights in navigable waters are such that the public has the right to walk along Lechuza’s property when it is inundated by such waters. Although there is no case law directly on point, we conclude that the public’s rights over navigable waters do not extend so far.
 

 Generally speaking, the waters of the Pacific Ocean are navigable waters of the United States. (See 43 U.S.C. § 1301;
 
 City of Long Beach
 
 v.
 
 Mansell
 
 (1970) 3 Cal.3d 462, 506 [91 Cal.Rptr. 23, 476 P.2d 423];
 
 Moore
 
 v.
 
 Purse Seine Net
 
 (1941) 18 Cal.2d 835, 836 [118 P.2d 1];
 
 Harbor Dist.
 
 v.
 
 Board of Supervisors
 
 (1930) 211 Cal. 271, 275 [295 P. 6].) Such navigable waters are public ways for the purposes of navigation and transportation of products
 
 *244
 
 (Harb. & Nav. Code, §§ 90, 100),
 
 [18]
 
 and are held in trust by the State for the benefit of the public’s recreational use as well, even when the underlying land is privately owned.
 
 (Pacific Gas & Electric Co.
 
 v.
 
 Superior Court
 
 (1983) 145 Cal.App.3d 253, 257-258 [193 Cal.Rptr. 336], overruled on another ground,
 
 Hubbard
 
 v.
 
 Brown
 
 (1990) 50 Cal.3d 189, 197 [266 Cal.Rptr. 491, 785 P.2d 1183].)
 
 [19]
 

 However, not all portions of the Pacific Ocean are considered to be navigable. Specifically, tidal waters above the mean high tide line are not navigable waters. (See 43 U.S.C. § 1301(a)(2) [“lands beneath navigable waters” are “all lands permanently or periodically covered by tidal waters
 
 up to but not above the line of mean high tide
 
 and seaward to a line three geographical miles distant from the coast line of each . . . State” (italics added)]; see also 33 C.F.R. § 322.2(a) (1997) [defining “navigable waters of the United States” for purposes of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403), which requires a permit from the Department of the Army’s Corps of Engineers for dredge and fill activities which alter “the course, location, condition or capacity of, . . . the channel of any navigable water of the United States” as “[generally, . . . those waters of the United States
 
 *245
 
 that are subject to the ebb and flow of the tide shoreward
 
 to the mean high water mark,
 
 and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce” (italics added];
 
 Leslie Salt Co.
 
 v.
 
 Froehlke
 
 (9th Cir. 1978) 578 F.2d 742, 753 [defining navigable waters as extending to “all places covered by the ebb and flow of the tide to the mean high water (MHW) mark in its unobstructed, natural state”];
 
 United States
 
 v.
 
 Cannon
 
 (D.Del. 1973) 363 F.Supp. 1045, 1050 [“It is . . . clear. . . that this body of [navigable] water extends in law to its mean high water mark and that it does not extend to areas above that mark which are occasionally inundated by waters of the [navigable] Bay. Indeed, . . . ‘marshlands and similar areas are . . . considered “navigable in law” . . . only so far as the area is subject to inundation by the mean high waters.’ [Citation.] ...[’]□ [T]he applicable rules of law foreclose the government’s attempt in this case to extend navigable waters landward of the mean high water mark, . . (Fn. omitted.)].)
 

 Therefore, we conclude that Judge Hiroshige did not err by concluding that Lechuza’s property is not subject to any public navigational or recreational rights landward of the ordinary high tide line as it may exist from time to time.
 

 4.-7.
 
 *
 

 D.
 

 Conclusion
 

 The southerly boundary of Lechuza’s lots is the mean high tide line, which is an ambulatory line formed by the intersection of the ordinary high tide plane and the shifting shoreline. This is the law in California, and is the result clearly intended by the original grantor of Tract No. 10630. Therefore, Judge Hiroshige erred by fixing the boundary as a stationary line based on the average of a number of surveys, although he did not err by concluding that the southerly boundary was not the fixed line shown on the 1932 Tract Map.
 

 The same ambulatory line also marks the point at which any public rights over navigable water ends, because ocean waters which extend above such a line, as a matter of law, are not navigable waters. Therefore Judge Hiroshige did not err by denying the State a recreational easement in favor of the public over Lechuza’s private property based on the State’s theory that such wave uprush past the mean high tide line constitutes navigable waters.
 

 
 *246
 
 Because Lechuza did not establish the location of its southerly boundary line and the location of MEHOA’s express easement before applying to the Coastal Commission for permits, the Coastal Commission’s denial of such permit applications was appropriate, and Judge O’Brien correctly denied Lechuza’s petition for a writ of mandate. Furthermore, Judge Hiroshige’s subsequent (and not yet final) determination of the location of the boundary line in the quiet title action was not “new evidence” within the meaning of Code of Civil Procedure section 1094.5, subdivision (e), and therefore his remand of the permit applications to the Coastal Commission for reconsideration in light of such “new evidence” was improper.
 

 Because the parties agreed to separate trials of certain causes of action, MEHOA had a right to dismiss its third cause of action without prejudice before the contemplated trial in which that cause of action would be heard, and therefore Judge Hiroshige erred by dismissing MEHOA’s third cause of action with prejudice and sanctioning MEHOA for the dismissal.
 

 The recorded CC&R’s provide for an express easement over Lechuza’s property running in favor of all of the lots in Tract No. 10630. Therefore, the court must, upon remand, determine the two alternate northerly lines at which the northerly boundary of the express easement lies or may lie.
 

 In view of all of the conclusions which we reach, it cannot be said that Lechuza was the “prevailing party” within the meaning of Civil Code section 1354, subdivision (f). Therefore, the award of attorney’s fees in its favor must be vacated.
 

 E.
 

 Disposition
 

 The stay order heretofore issued shall be lifted upon issuance of the remittitur by this court.
 

 The judgment in favor of Lechuza and against MEHOA is reversed. Judge Hiroshige is directed to (1) vacate the order dismissing with prejudice MEHOA’s third cause of action, (2) allow MEHOA leave to dismiss it without prejudice, (3) vacate the order awarding attorney fees and sanctions to Lechuza and against MEHOA pursuant to Civil Code section 1354, and (4) conduct further proceedings not inconsistent with the views expressed herein.
 

 As to the “partial judgment” involving issues between Lechuza and the Coastal Commission, the Lands Commission, and the State, let a writ of mandate issue directing Judge Hiroshige to:
 

 vacate his order granting Lechuza’s motion to remand the permit application matter to the Coastal Commission pursuant to Code of Civil Procedure section 1094.5, subdivision (e);
 

 
 *247
 
 vacate his order setting the southerly boundary as a fixed line based on an average of various ordinary high tide lines;
 

 vacate his order granting summary adjudication in favor of Lechuza on the issue of takings liability;
 

 vacate his order awarding sanctions against the Lands Commission for bringing a motion for new trial; and
 

 conduct further proceedings not inconsistent with the views expressed herein.
 
 [20]
 

 The Coastal Commission’s appeal of the trial court’s order suspending the automatic stay under Code of Civil Procedure section 1110b is dismissed as moot.
 

 The Coastal Commission, the Lands Commission, and MEHOA shall recover their costs in connection with MEHOA’s appeal from the judgment and the Coastal Commission’s and the Lands Commission’s writ proceeding.
 

 Kitching, J., and Aldrich, J., concurred.
 

 A petition for a rehearing was denied January 14,1998, and the petition of respondent Lechuza Villas West for review by the Supreme Court was denied April 1, 1998.
 

 [1]
 

 “This case presents another chapter in the turbulent legal history of the historic old Rancho Topanga Malibu Sequit. This rancho lies north and west of Santa Monica, in southern California. Originally it contained over 13,000 acres of land, and fronted 22 miles along the Pacific Ocean. [QQ Frederick Hastings Rindge acquired the rancho in 1890. Upon his death in 1905, his widow succeeded to the ownership. She kept the rancho for many years. And she valiantly resisted every encroachment upon or over its vast domain. It was only after extended litigation that a right of way for a road along the coast was secured.
 
 (County of Los Angeles
 
 v.
 
 Rindge Co.
 
 [(1921)] 53 Cal.App. 166 [200 P. 27].) [IQ Title to the rancho was put in Marblehead Land Company, a family corporation. Lapse of time, the inexorable demand for land by a population increasing at incredible speed, and the business depression beginning in 1929 accomplished what Mrs. Rindge had feared and fought against for so long. In 1933 Marblehead Land Company found itself in financial difficulties, control of the corporation passed to a board of directors representing bondholders and creditors, and that alien management subdivided and sold a large part of the rancho. (Chap. 10, United States Bankruptcy Act.) [QD Part of the property so subdivided and sold was located in Malibu Canyon. Malibu Canyon extends northerly from the ocean beach to the precipitous Santa Monica mountains. The beach here runs easterly and westerly. Draining the area is Malibu Creek.”
 
 (Gagnon
 
 v.
 
 Adamson
 
 (1953) 122 Cal.App.2d 253, 254-255 [264 P.2d 620].)
 

 [2]
 

 The terms “mean” and “ordinary” will be used interchangeably throughout this opinion.
 

 [3]
 

 Notably, the recorded CC&R’s themselves expressly contemplated the possibility that the mean high tide line might move so as to modify the location and, in certain circumstances, the size of MEHOA’s easement.
 

 [4]
 

 Notably, nothing in these letters indicated that the Lands Commission was suggesting that the proposed
 
 revetment,
 
 as opposed to the proposed residences, was landward of the surveyed mean high-tide lines as then known to the Lands Commission.
 

 [5]
 

 These two mandate proceedings, Lechuza Villas West v. State Lands Commission (Super. Ct. L.A. County, 1991, No. BC030228) and Lechuza Villas West v. State Lands Commission (Super. Ct. L.A. County, 1991, SS001187), were consolidated on December 31, 1991 (collectively, case No. SS001187).
 

 [6]
 

 In this case, we discuss the separate trial court proceedings involving the Coastal Commission and the Lands Commission. These are both agencies of the State and we recognize that it is a party to all of those proceedings. However, for convenience, we simply will refer to the State parties as the Coastal Commission and the Lands Commission unless the context or the terms of explicit court rulings otherwise require.
 

 [7]
 

 Because the issues in this matter were decided by two different judges, Judge O’Brien and Judge Ernest M. Hiroshige (Judge Hiroshige), and because there is some question as to the interdependence and binding nature of such rulings, we will refer to the decisionmaker by the name of the particular judge involved, rather than using the generic term “the trial court.”
 

 [8]
 

 The globose dune beetle apparently is an endangered species indigenous to the Malibu area.
 

 [9]
 

 According to MEHOA, this is because the stipulation was prepared two months before MEHOA filed its cross-complaint, and because the stipulation was not amended to dispose of MEHOA’s third cause of action. MEHOA further claims, while acknowledging that the record does not reflect such fact, that the parties did in fact expressly agree that the third cause of action would be tried as part of the third phase, i.e., the takings phase. Notably, while Lechuza casts various aspersions at MEHOA as to MEHOA’s bad faith and reasons for dismissing its third cause of action, it does not deny that the parties agreed that the third cause of action would be tried at the same time as the takings claims.
 

 [10]
 

 Judge Hiroshige adopted as his decision the reasoning and authorities contained in Lechuza’s offer of proof in support of determination of a fixed seaward boundary, filed November 13, 1995.
 

 [11]
 

 “Actually, this second issue is not properly a matter for a cross-appeal. Judge Hiroshige’s June 11, 1996, judgment held that (1) the State had failed to prove the existence of a public easement in navigable waters for recreational purposes that existed independently of its claim of ownership to tide and submerged lands, and therefore the subject property was not encumbered by such an easement; and (2) the State had failed to establish the existence of an easement for public recreational use based on implied dedication under the doctrine in
 
 Gion
 
 v.
 
 City of Santa Cruz, supra, 2
 
 Cal.3d 29, and therefore the subject property was not encumbered by such an easement. In other words, Lechuza prevailed in the lower court on this issue, so it is not aggrieved for purposes of appealing from this portion of the judgment. Instead, Lechuza really disputes the Lands Commission’s contention on appeal that Judge Hiroshige erred by concluding that there are no public recreational rights over privately owned lands when such lands are covered by the ocean’s waters.
 

 [12]
 

 Subdivision (f) of section 1094.5 provides: “The court shall enter judgment either commanding [the administrative agency] to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court’s opinion and judgment and may order [the administrative agency] to take such further action as is specifically enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the [administrative agency].”
 

 [13]
 

 This has long been a staple of the common law. As our Supreme Court pointed out in 1916, “The proposition [that a boundary marked by the mean high tide line remains fixed at the location of the mean high tide line as it was situated on some particular past date] is
 
 *236
 
 contrary to the great weight of authority. The act of April 13, 1850, declared that the common law of England shall be the rule of decision in this state, where it is not repugnant to the federal or state constitution or to the statutes of the state. (Stats. 1850, c. 95, p. 219.) This provision is now a part of our Political Code. (Sec. 4468.) The law of alluvion is thus stated by Blackstone: ‘And as to lands gained from the sea, either by alluvion, by the washing up of sand and earth, so as in time to make terra firma, or by dereliction, as when the sea shrinks below the usual water marks; in these cases the law is held to be that if the gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For de minimus non curat lex; and besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is, therefore, a reciprocal consideration for such possible charge or loss.’ [Citation.]”
 
 (Strand Improvement Co.
 
 v.
 
 Long Beach
 
 (1916) 173 Cal. 765, 771 [161 P. 975], italics omitted.)
 

 Here, the only evidence was that the changes to the shoreline between Lechuza’s property and that of the State were gradual, imperceptible, and the result of natural causes. Therefore the legal boundary line between Lechuza’s property and the State’s tidelands moves back and forth with the gradual, seasonal accretion and erosion of the shore.
 
 (State of Cal.
 
 ex rel.
 
 State Lands Com.
 
 v.
 
 Superior Court, supra,
 
 11 Cal.4th at pp. 63-69.) There is no legal authority for Lechuza’s position that the difference between regular seasonal accretion and erosion should be or must be “split” between the two landowners by way of a permanently fixed boundary line.
 

 [14]
 

 The court in
 
 Kent Estate
 
 merely stated that to the extent the trial court’s findings, conclusions, and judgment implied that ordinary high tide is a variable plane, “they impart uncertainty.” (242 Cal.App.2d at p. 160.) However, because the reviewing court held that the plane of average high tide did not vary, it is inferable that it also held that the trial court
 
 erred
 
 to the extent it concluded that such
 
 plane
 
 varied.
 

 [15]
 

 The hospital’s title derived from an act by the Legislature of May 4,1852, granting to the town which was the predecessor of the City of Oakland the lands lying “between high tide and ship channel.”
 

 [16]
 

 Several other cases discussed by the parties bear some mention. Lechuza relies on
 
 County of Lake
 
 v.
 
 Smith
 
 (1991) 228 Cal.App.3d 214 [278 Cal.Rptr. 809] for the proposition that “extreme” positions of water should not be used as a shoreline boundary in place of either a boundary based upon an average water level or a boundary which the parties had agreed upon. Although the court in
 
 County of Lake
 
 referred to the decision in
 
 Kent Estate (id.
 
 at p. 225), such reference was (1) based on the erroneous assumption that
 
 Kent Estate
 
 held that a boundary along the ocean’s waters could not move and had to be fixed, (2) irrelevant, given that
 
 County of Lake
 
 involved nontidal waters, i.e., the waters of a lake, and (3) dicta, given that the court in
 
 County of Lake
 
 did not adopt an average water elevation as a basis for establishing the legal boundary, but instead used a boundary line established in a prior court decree.
 
 (Id.
 
 at pp. 235-237.)
 

 The case of
 
 Littoral Development Co.
 
 v.
 
 San Francisco Bay Conservation etc. Com.
 
 (1994) 24 Cal.App.4th 1050 [29 Cal.Rptr.2d 518], also cited by both Lechuza and the Lands Commission, merely held that “mean high tide” means exactly that, not “highest recorded high tide”
 
 (id.
 
 at p. 1059), and reiterated that the common law boundary of the tidelands is the mean high tide line.
 
 (Id.
 
 at pp. 1060-1061.) The case did not hold that the boundary set by the mean high tide line was or should be fixed, and, in fact, intimated just the opposite.
 
 (Id.
 
 at p. 1059 [“the line of mean high tide itself is always, by definition, a line ‘subject to tidal action’;”];
 
 id.
 
 at p. 1060 [“ ‘. . . by the common law, the shore “is confined to the flux and reflux of the sea at ordinary tides.” ’ [Citation.].’ ”)
 

 [17]
 

 Alternatively, Lechuza’s second proposition is simply wrong. Of the cases cited by Lechuza in support of its assertion that the acceptance and recordation of the tract map conclusively established the seaward boundary, arguably the most applicable of such cases is
 
 Abbot Kinney Co.
 
 v.
 
 City of Los Angeles
 
 (1959) 53 Cal.2d 52 [346 P.2d 385]
 
 (Abbot Kinney),
 
 which Lechuza characterizes as a case in which a “tract map provided conclusive evidence of [the] location of [the] seaward boundary depicted thereon as ‘Ocean.’ ” However, that case does not so hold.
 

 In
 
 Abbot Kinney,
 
 plaintiffs were private citizens who held a reversionary interest in ocean front property conveyed to the City of Los Angeles for use as a park or beach, and who sued to recover title on the grounds that the city, by constructing a parking lot and restrooms on such property, had breached the conditions in the deed. The trial court granted judgment in favor of the plaintiffs, but then granted the city a new trial. Both parties appealed, and the California Supreme Court held that the trial court had lacked jurisdiction because the State was a necessary party, because there was an issue as to whether the plaintiffs’ predecessor in interest or the State, which had granted to the city the tidelands within the city’s borders, had owned those portions of the property seaward of the mean high tide line. (53 Cal.2d at p. 57.) This was an issue because the plaintiffs claimed that their title derived from a Mexican land grant, and the grant of tidelands by the State to the city specifically excepted therefrom any property held or claimed under, through or from a Mexican land grant. After holding that the trial court lacked jurisdiction, the court noted, in dicta, that nothing in the record supported the plaintiffs’ premise that the Mexican land grant included lands seaward of the mean high tide line, i.e„ any tidelands, given that, absent any showing to the contrary, the upland owner obtains title only to the high water mark, and given that the tract maps filed as exhibits showed the westerly, i.e., seaward, boundary of the property as “Ocean,” which
 
 implied
 
 that
 
 *242
 
 the mean high tide line was the boundary.
 
 (Id.
 
 at pp. 57-58.) In other words, the court was not asked to consider whether a tract map which showed the seaward boundary as “Ocean” conclusively established that the legal boundary was the mean high tide line, let alone whether such boundary was fixed or ambulatory.
 

 In contrast to Lechuza’s lack of authority for the proposition that a tract map conclusively establishes a legal boundary, there
 
 is
 
 authority which holds that although maps showing the boundaries of lots are some evidence which may create a question of fact as to the true boundaries, such maps are not conclusive as to the legal boundaries.
 
 (City of Los Angeles
 
 v.
 
 Duncan
 
 (1933) 130 Cal.App. 11, 13-14, 14-15 [19 P.2d 289];
 
 City of Oakland
 
 v.
 
 Wheeler
 
 (1917) 34 Cal.App. 442, 450-452 [168 P. 23].)
 

 [18]
 

 Harbor and Navigation Code section 90, “Application to navigable waters,” provides: “The provisions of this Division [division 1.5, Navigable Waters], in so far as they are not in conflict with the admiralty and maritime jurisdiction and laws of the United States, apply to navigable waters of the United States.”
 

 Section 100, “Navigable waters defined,” provides: “Navigable waters and all streams of sufficient capacity to transport the products of the country are public ways for the purposes of navigation and of such transportation. However, the floodwaters of any navigable river, stream, slough, or other watercourse while temporarily flowing above the normal high-water mark over public or private lands outside any established banks of such river, stream, slough, or other watercourse are not navigable waters and nothing in this section shall be construed as permitting trespass on any such lands. For the purposes of this section, ‘floodwaters’ refers to that elevation of water which occurs at extraordinary times of flood and does not mean the water elevation of ordinary annual or recurring high waters resulting from normal runoff.”
 

 [19]
 

 “All navigable waterways are held in trust by the state for the benefit of the public [citation], and the public may use such waters for recreational purposes. [Citations.] Generally, sovereign ownership of navigable waterways extends to the underlying land. [Citation.] Where underlying lands are in private ownership, however, they remain subject to public trust restraints and may not be alienated or used in a manner harmful to trust purposes. [Citations.] [<1 The public right of access to navigable waters is of constitutional origin. [Citation.] . . . [<1 Case law applying the constitutional provision confirms the public right of passage, in a lawful manner, over waters usable only for small-craft recreational boating, irrespective of the ownership of the water bed. [Citations.]. . . [H The Constitution and the decisions applying it make it abundantly clear that [a private party’s] ownership interest in the land underlying [navigable waters] . . . could not encompass any interest in the waters themselves which would interfere with the public trust. [Citation.] In particular, [the private property owner] does not possess any right to exclude members of the public from entering on and using the [navigable waters] for recreational purposes. [Citations.] On the contrary, plaintiff as a member of the public has a constitutional right to navigate [the navigable waters] in his boat.”
 
 (Pacific Gas & Electric Co.
 
 v.
 
 Superior Court, supra,
 
 145 Cal.App.3d at pp. 257-258, fns. omitted.)
 

 *
 

 See footnote,
 
 ante,
 
 page 218.
 

 [20]
 

 Any judgment in the quiet title action must make it clear that the southerly boundary line between Lechuza’s property and the public tidelands is an ambulatory line which moves as described in this opinion. However, this does not preclude the parties from obtaining a judicial determination of such line’s location as of any specific date or dates, assuming that such a determination would be useful in negotiations between the parties or in connection with Lechuza’s future permit applications.