Filed 3/19/13  Palmer v. Silveira CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ALAN B. PALMER, as Trustee, etc., et al.,<br><br>  Plaintiffs, Cross-defendants, and Respondents,<br><br>  v.<br><br>ANTHONY P. SILVEIRA, as Trustee, etc., et al.,<br><br>  Defendants, Cross-complainants and Appellants. | H037588<br>(Santa Cruz County<br>Super. Ct. No. CV163244) |

Plaintiffs Alan Palmer and Santa Cruz Properties LLC brought this action against neighboring landowners Anthony and Kandy Silveira, to expunge certain recorded agreements between defendants and the parties' common predecessors in interest insofar as those agreements might establish or give record notice of servitudes burdening plaintiffs' property.  From a judgment in plaintiffs' favor, defendants appeal.  Plaintiffs contend that defendants have not preserved their challenges to the judgment.  We reject this contention, but conclude that defendants have not carried their burden of establishing reversible error.  Accordingly, we will affirm the judgment.

BACKGROUND

It is undisputed that defendants own property at 4630 West Walnut Street in Soquel, unincorporated Santa Cruz County.[1]  Plaintiff Palmer owns property two doors to the west of defendants' parcel.  Plaintiff Santa Cruz Properties owns two parcels fronting on Porter Street, the more northern of which touches defendants' southern boundary.  Prior to 1986, all of these properties were apparently owned by May Gravenhorst Stauffer and Peter J. Gravenhorst (collectively, Gravenhorst/Stauffer).

On June 21, 1985, defendants entered into an agreement to purchase 4630 Walnut Street from Gravenhorst/Stauffer.  Although the record fails to competently establish many of the pertinent details of the sale, recitals in the documents at issue suggest that by the time the sale closed, the property was being used for partly residential and partly commercial purposes.[2]  According to defendants' trial brief, the purchase agreement "was conditioned upon [their] ability to convert this property from residential to commercial property."  They assert that among the permit conditions was the provision of eight parking spaces, which was four more than were located on the 4630 Walnut parcel.  The county also required that defendants enter into a joint parking and circulation agreement with Gravenhorst/Stauffer, to be reviewed and approved by county planners.

---

[1]  Exemplifying the seeming insouciance with which both sides seem have conducted this litigation, defendants' property is erroneously identified in both the complaint and cross-complaint as "4630 Porter Street."  Moreover, in their trial brief plaintiffs describe defendants' property as being situated "at the corner of Walnut Street and Porter Street," though six lines later they describe it as "parcel 11" on an attached map, which clearly shows a parcel 12 separating parcel 11 from Porter Street.

[2]  An October 1985 permit recites that a house on the property had burned down and been replaced by a structure "constructed to meet the building code standards of a commercial building."  The document recited that the building was then being "used as a dwelling," but that its "current proposed uses would include three offices on the first floor and two apartments on the second floor."  A year later , the use agreement referred to the building's "partial current use as residential property."  The record does not competently establish the present use of the building.

In June 1986, the parties executed, and defendants recorded, the two agreements that are the subject of this action. One of them, entitled "Use Agreement," recited the parties' intention to address certain requirements "to be imposed by" county planning authorities "on the said property related to its partial current use as residential property." As here relevant it provided that "[i]n the event the County . . . imposed [*sic*] additional parking requirements and a recreational area requirement covering the residential use," the sellers would "make available to Buyer on adjacent properties owned by Seller . . . , . . . four parking spaces, and a required 400 Sq. Ft. vacant parcel to be improved and landscaped at Sellers['] expense as required by Santa Cruz County." Defendants would pay $8,000 for the parking spaces and $6,000 for the vacant parcel. Under stated circumstances, defendants would be obligated to sell these spaces back to the sellers at the same price. The agreement addressed other matters as well, but is discussed by the parties only as it called for the sale of the parking spaces; we will therefore refer to it as the "parking agreement."

The second agreement, entitled "Road Maintenance and Circulation Agreement," recited that it "pertain[ed] to" a "right of way described as Parcel Four" in an attached exhibit. The exhibit depicted a road or causeway apparently traversing or touching upon five properties, including defendants' property, two of plaintiffs' four parcels, and another property owned by the Bermans, who were named in the pleadings below but not brought into the action. The agreement set out certain rights and obligations with respect to the depicted roadway, stated that "the rights and responsibilities contained in the Agreement shall constitute covenants running with the land," and expressed the parties' intent "to obligate themselves, their heirs, personal representatives, successors and assigns to maintain and improve said road in accordance with the terms and conditions of this agreement." However the agreement further provided that "[d]epending on when the commercial development/improvements are approved" for the remaining parcels,

3

"vehicle, pedestrian, parking and circulation arrangements shall be planned and agreed in writing between each parcel mentioned above."  In addition, it was said to be the sellers' intention that they or their successors would "further develop the existing vehicle and pedestrian right of way to enter off Porter Street to run through [three specified parcels] and cut out of [one of them] to ultimately exit into West Walnut."  The agreement also referred to an existing "recorded right of way" already serving defendants' property.  We will refer to this agreement as the "road agreement."

Plaintiffs commenced this action on March 25, 2009, by a verified complaint in which they alleged that they were "engaged in a business enterprise involving potential integration of their properties in connection with parking and traffic flow for . . . improvements to be constructed under the Santa Cruz County permit process."  The first cause of action sought declaratory relief, in that plaintiffs contended that the parking and road agreements "rested upon specific conditions which never took place and for that reason endow[ed] defendants with no assertable rights," whereas defendants contended that the instruments "comprehend the eventual development of the properties now owned by plaintiffs and that the parking rights contained in these documents were paid for and persist in their vitality."  Plaintiffs sought "a declaration of rights and duties of the parties respecting the validity" of the instruments in relation to plaintiffs' properties.

In the second cause of action, plaintiffs sought a decree quieting title in themselves and declaring their property "to be free and clear of any encumbrances, rights of way, or other obligations resulting or arising from the recordation of" the challenged instruments.  In the third cause of action they sought "a judgment cancelling" those instruments "from the public records of Santa Cruz County, California."

4

On May 6, 2009, defendants filed an answer consisting of a general denial and a number of affirmative defenses.[3]  They also filed a verified "Cross-Complaint for Damages (Slander of Title)" alleging that plaintiffs had wrongfully failed to disclose the road and use agreements in an application seeking permits to develop plaintiffs' parcels. This conduct was alleged to have "adversely impaired the vendibility of cross-complainants['] property," causing damages in unspecified amounts.  The conduct was also alleged to have been malicious, warranting punitive damages.  Defendants subsequently sought and obtained leave to amend the cross-complaint to add the previously unnamed neighbors, Dale and Terry Berman, as necessary parties and to assert additional causes of action for declaratory relief, quiet title, and injunctive relief.  It does not appear that the Bermans were ever served with the cross-complaint—or the complaint, in which they had also been named.

In a trial brief plaintiffs asserted that the road and parking agreements "address[ed] an entirely conditional set of circumstances which never took place."  In essence, they claimed that the instruments were intended to address certain planning requirements that defendants might encounter in converting their property to commercial use, but that the county had never imposed these requirements and the instruments no longer served any purpose.  "There has never been a 'road' in the parcels described," plaintiffs' counsel wrote; "instead, without any interference or additional conditions imposed by the County of Santa Cruz, Silveiras have continuously maintained their property with a commercial

---

[3]  In filing a general denial, counsel apparently overlooked the fact that the complaint was verified.  This required that "the denial of [its] allegations . . . be made positively or according to the information and belief of the defendant."  (Code Civ. Proc., § 431.30, subd. (d); see 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1061, p. 498.)  Indeed the form answer filed by defendants plainly stated that it could only be used if "[t]he complaint is not verified" or "the action is subject to the economic litigation procedures of the municipal and justice courts."  The answer was therefore vulnerable to a motion to strike, but its deficiencies apparently went unnoticed.

rental on the first floor and residential apartments on the second floor.  Parking has never been an issue."  The memorandum further asserted that in recent years, a parking district had been formed "providing more than ten public parking spaces . . . across from [defendants'] property."  It described the parking agreement as a "hoax" under which plaintiffs could satisfy planning authorities, if necessary, by " 'buy[ing]' additional spaces for parking and then 'sell[ing] back' the spaces after satisfying the County requirements."

Defendants asserted in their trial brief that they bought their property from Gravenhorst/Stauffer on the condition that they would be able to convert it "from residential to commercial [use]."  Toward that end, "application was made" to the county "for a development permit."  A permit was granted, but required that four parking spaces be provided in addition to the four already on defendants' property, and that defendants and Gravenhorst/Stauffer "enter into a joint parking and circulation agreement to be reviewed and approved by the Planning Department."  Defendants acknowledged that the county had not yet required them to actually furnish the additional four parking spaces prescribed by their use permit, but suggested that it might yet do so, stating, "[S]hould the County impose the actual parking requirements . . ., [defendants are]  relying on the terms of the Use Agreement to meet the parking requirements and not lose the commercial use of their property."[4]  In their legal discussion, defendants acknowledged that "A restriction or covenant may not be enforceable where there has been a material change in conditions to the extent that the original purpose for the restriction becomes obsolete."  This test was not satisfied, however, by the mere fact that plaintiffs now sought to develop what had

---

**4** Throughout the proceeding defendants have described the parking agreement as intended to accommodate the *commercial* use of their property.  They ignore the plain recitals in the use agreement itself that its purpose was to accommodate requirements growing from the building's "partial current use as *residential* property."  (Italics added.)

been the Gravenhorst/Stauffer property, since that was "precisely the event that both the County . . . and [defendants] considered in making these agreements with . . . the predecessor in interest to plaintiffs."

Trial took place on August 17, 2011. According to the minutes, testimony was received from plaintiff Alan Palmer and defendant Anthony Silveira. Seven exhibits were received, including a copy of a project, a planning document, a parcel map, and several color photos of the property. Plaintiffs' counsel made a motion for judgment, which the trial court denied, instead taking the matter under submission. The record contains no indication that any party requested a statement of decision.

On August 29, 2011, the court issued a document entitled "Judgment," stating in relevant part, "Judgment is rendered in favor of the Plaintiff and against the Defendants as to the Plaintiff's three causes of action: 1) Declaratory relief, 2) Quiet Title, and 3) Cancellation of Instruments. The Court considers this matter as a good faith dispute and appreciates the manner in which counsel and the parties presented their respective views. However, the subject Road Maintenance and Circulation Agreement and the Use Agreement were recorded in June, 1986. Over the next twenty-five years, none of the events which were contemplated with the creation of these agreements have taken place. A review of Civil Code Sections 885.010, 885.020 and 885.030 lead [sic] this Court to the conclusion that invalidation of these instruments, in order to remove whatever clouds upon title they may be causing, is appropriate. It should further be noted that circumstances have changed in relationship to the Santa Cruz County Ordinances adopted in 1995 and 2009.[5] Judgment in favor of the Plaintiff on the three causes of action outlined within the complaint. Judgment in favor of the Cross-Defendant on the related cross-action."

_____

[5] This was apparently a reference to ordinances, of which plaintiffs sought judicial notice, creating an "employee/owner permit parking program" to be "administered by the redevelopment agency administrator." (Santa Cruz County Code., § 9.43.135.)

7

On September 7, 2011, plaintiffs filed a motion to modify the judgment. Although only the notice of motion has been included in the clerk's transcript, we requested that the clerk also transmit copies of the supporting declaration and memorandum of points and authorities, which we have augmented the record to include. The gist of the motion was that the "Judgment" of August 29 omitted any descriptions of the affected properties, and was thus insufficient to give record notice of "the action taken by the Judge after the court trial . . . ." Defendants filed no opposition to the motion. When it was heard, counsel for defendants appeared and stated that he had communicated a concern to plaintiffs' counsel that the proposed judgment included an easement that had not been at issue in the litigation. He understood that plaintiffs' counsel had deleted the objectionable language. When the court asked whether the documents as so amended "meet with your approval," he replied, "Yes. I just want to make it clear for the record that the Michael Liles easement is not a part of this litigation." Plaintiff's counsel affirmed that he understood this to be the case. The court indicated that it was signing the modified judgment.

The modified judgment reiterated the language of the original "Judgment," but followed it with four paragraphs spelling out the relief to which plaintiffs were entitled. It also incorporated some 14 pages of attachments including property descriptions and the two challenged agreements. It declared that plaintiffs were "entitled to the ownership of their respective properties as set forth above free and clear of any claims or rights on the part of Defendants . . . in or to the said real property of plaintiffs," and that the two instruments "are hereby cancelled."

On November 10, 2011, defendants filed a notice of appeal "from the Order Granting Motion to Modify Judgment . . . entered on October 11, 2011 . . . ." In a notice designating the record on appeal, they requested a reporter's transcript only of the oral

8

proceedings at the hearing on the motion to modify the cross-complaint; no transcript of the trial was requested.

DISCUSSION

## I. *Scope of Appeal*

Prior to the completion of briefing, plaintiffs filed a motion to dismiss the appeal on the ground that defendants' failure to appeal from the "underlying judgment" of August 29, 2011, precluded a challenge to the merits of the trial court's adjudication. They contended in effect that the later judgment was not separately appealable because it made no substantive change in the earlier one, and that insofar as it did effect a change, defendants' counsel had consented to it. We denied the motion.

In their brief on appeal plaintiffs again raise defendants' failure to appeal from the earlier "judgment," this time as a ground to hold that defendants are barred by "waiver and estoppel" from contesting the correctness of the trial court's determination on the merits. They assert that plaintiffs could have appealed from the first judgment, and that having failed to do so they can only challenge the second judgment to the extent that it differs from the first. Since their counsel consented to any differences, the argument continues, no part of the judgment is open to appellate review.

Plaintiffs could indeed have appealed from the "judgment" of August 29, in the sense that they could have filed a notice of appeal referring to it. We are not persuaded, however, that such an appeal would properly lie, i.e., would confer jurisdiction on this court over the substantive controversy between the parties. Rather we have concluded that the document issued on August 29 was not an appealable judgment. It did not fulfill the basic function of a judgment, which is to effect "the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.) To perform this function, " ' "[a] judgment must be definitive. By this is meant that the decision itself must purport to decide finally the rights of the parties upon the issue submitted, by

9

specifically *denying or granting the remedy* sought by the action." ' " (*Kosloff v. Kosloff* (1944) 67 Cal.App.2d 374, 379-380, italics added, quoting *Makzoume v. Makzoume* (1942) 50 Cal.App.2d 229, 232.)  A judgment in favor of a defendant must ordinarily include an "express declaration of the ultimate rights of the parties, such as that 'plaintiffs shall take nothing,' or 'the action is dismissed.' " (*Swain v. California Casualty Ins. Co.* (2002) 99 Cal.App.4th 1, 6; *Davis v. Superior Court* (2011) 196 Cal.App.4th 669, 673.) Where judgment is for the plaintiff, it must actually *award the relief* to which the court has found him entitled.  (See *Hucke v. Kader* (1952) 109 Cal.App.2d 224, 229 [statement in judgment that " 'plaintiffs have judgment as prayed for in this complaint' " would be "deleted from the judgment" as "uncertain and indefinite"].)

Here plaintiffs sought three remedies:  declaratory relief concerning the current validity of the road plan and the use plan, a decree quieting title as against those instruments, and a judgment cancelling them.  The purported judgment of August 29 failed to properly award any of these remedies.  It is most grievously deficient as a judgment quieting title.  Such a judgment must *decree* the state of title as the court finds it to be.  As with any judgment affecting title to real property, it must specifically identity the lands affected, using a description "so certain that a stranger may be able to clearly identify the particular tract." (*People v. Rio Nido Co.* (1938) 29 Cal.App.2d 486, 488.)  It "must be as clear and explicit as a deed which purports to convey real property." (*Id.* at p. 489; *Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 777.)  That is, it must set forth the affected property interests with sufficient particularity that when recorded it will effectively convey notice of their status as determined by the court.  A judgment which purports to adjudicate property rights, but in which "nothing is described," may be "pronounced a nullity for uncertainty of description." (*Newport v. Hatton* (1924) 195 Cal. 132, 156.)  " '[A]n impossible, wrong, or uncertain description, or no description at all, renders the judgment erroneous and void.' " (*Newman v.*

10

*Cornelius* (1970) 3 Cal.App.3d 279, 284, quoting *Newport v. Hatton, supra,* 195 Cal. 132, 156; *Lechuza Villas West v. California Coastal Com'n* (1997) 60 Cal.App.4th 218, 242.)

Here the original judgment failed entirely to describe the affected property or the interests adjudicated. If accepted by the county recorder for recordation—a dubitable hypothesis—it would have failed to impart notice that the challenged agreements had ceased to burden plaintiffs' property. Indeed this is precisely why plaintiffs moved to "modify" the purported judgment. As counsel wrote in support of that motion, the August 29 instrument "d[id] not reflect with certainty in the Official Records of Santa Cruz County, California, the effect of rulings in favor of plaintiffs on the issues of declaratory relief, quiet title, and cancellation of instruments." This failure rendered that instrument ineffectual to clear plaintiffs' title of the cloud they brought this action to eliminate.

Much the same is true with respect to the remedy of cancellation of instruments. The statute governing such relief contemplates that a judgment for a successful plaintiff will not only adjudge the challenged instrument "void or voidable" but order that it be "delivered up or canceled." (Civ. Code, § 3412.) Indeed the original formulation was "delivered up *and* canceled," the latter term being used in its original sense of physically striking or obliterating the language found "void or voidable." (See *Upton v. Archer* (1871) 41 Cal. 85, 88 [judgment reversed "with directions to enter a judgment, ordering the deed to be delivered up and canceled"]; *Lewis v. Tobias* (1858) 10 Cal. 574, 576 [discussing equitable power "to order a written instrument to be delivered up and canceled"]; *Nelson v. Meadville* (1937) 19 Cal.App.2d 68, 69 [judgment "decree[d] that the instruments in question were void; that defendant was entitled to no rights thereunder; and that the instruments be canceled"]; American Heritage College Dict. (3d ed. 1997), p. 204 ["cancel" defined as "To cross out with lines or other markings"; originating in

11

Latin *cancellare*, "to cross out"]; Black's Law Dict. (9th ed. 2009), p. 233, col. 2 ["To destroy a written instrument by defacing or obliterating it"].)[6] In modern times courts typically forego the physical act of cancellation; but the judgment must still declare the invalidity of one or more specified instruments. (See *Wolfe v. Lipsy* (1985) 163 Cal.App.3d 633, 638 [judgment "provided, inter alia, that the deed of trust executed by Irene Basurto on October 20, 1976, is void.)

Even as a judgment for declaratory relief we find the instrument of August 29 deficient under the circumstances here. Such a judgment should, as the name indicates, take the form of a "declaration" concerning the rights and obligations in controversy. (Code Civ. Proc., § 1060.) Courts have often overlooked deficiencies in this regard where the intendment of the adjudication is sufficiently clear. (See, e.g., *Kelso v. Sargeant* (1936) 11 Cal.App.2d 170, 179 [declaratory judgment "should be entered in a peculiarly declaratory form," but judgment was sufficient where "in substance and effect" it fixed "not only of the rights of the respective parties, but a determination of the construction which should be given to" their agreement]; *McLean v. Tucker* (1938) 26 Cal.App.2d 126, 129 [despite failure to "specifically set forth the rights of the parties as a declaratory judgment," judgment adequately determined their rights by directing delivery of deed and quieting title in defendant]; *R.G. Hamilton Corp. v. Corum* (1933) 218 Cal. 92, 94-95 [judgment merely declaring parties' rights to be as stated in findings was

---

[6] The concept of physical "cancellation" is illustrated by *Estate of Olmstead* (1898) 122 Cal. 224, 228, where the court used the term to describe some of the marks a decedent had made on a will: "[T]he lines, interlineations, erasions, cancellations, and new writings of words, phrases, or sentences were very numerous. . . . Each and all of [the decedent's seven signatures] were canceled by two ink lines drawn through and across their full length. . . . Some of the clauses in the will were canceled by ink lines drawn the full length of every line of the clause, and by cross lines extending from the top to the bottom. . . . The 'two' was canceled by two ink lines drawn through the word, and the word 'one' written in ink immediately over it."

12

"rather unusual" and "not a practice to be commended," but reviewing court could not say it "ha[d] rendered the judgment ineffectual as long as the rights and duties of the respective parties may be ascertained therefrom"; sufficiency "is to be judged from its substance rather than from its form"].)  But a judgment in the form of the August 29 instrument was virtually useless to plaintiffs.  Although it alluded to the road and parking agreements and by clear inference found them no longer enforceable, it did not define them with sufficient specificity to allow any stranger to the judgment to know what had been invalidated.[7]

It thus appears that the instrument of August 29, 2011, was ineffectual as a final judgment determining the rights of the parties.  It was, in at least this sense, " 'void.' " (*Newman v. Cornelius*, *supra*, 3 Cal.App.3d at p. 284.)  Some judgments are appealable even though void in some sense.  (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 93, p. 155.)  But "[i]f the invalidity results from the failure to comply with the formal requirements of entry of a final judgment or order, it is more properly characterized as a preliminary order or purported judgment that is not a final judgment at all." (*Id.* at p. 156.)  We believe this principle applies to the instrument of August 29, which is best characterized as a "purported judgment that is not a final judgment at all." (*Ibid.*)  Indeed, if not for its label and the recitals that "[j]udgment is rendered," it would most readily be viewed as a notice of tentative or intended decision.  It awards no relief of any

---

[7] Moreover, even if the August 29 instrument is deemed sufficient as a judgment for declaratory relief, it cannot be deemed a final judgment on that basis because of its failure to effectively adjudicate the other two causes of action.  "The rule has long been well settled that there can be but one final judgment in an action regardless of how many counts the complaint contains or how many issues of law or fact are presented.  The purpose of this rule is to prevent piecemeal decisions and multiple appeals." (*McCarty v. Macy & Co.* (1957) 153 Cal.App.2d 837, 840; see *Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 645 ["Ordinarily, there can be only one final judgment in an action and that judgment must dispose of all the causes of action pending between the parties."].)

13

kind.  It really does nothing more than identify the prevailing party and give some indication of the court's reasons for ruling in that party's favor.  We conclude that it was not appealable, and that defendants' failure to appeal from it has no bearing on appellate jurisdiction or the scope of issues open to review.

A slight additional problem is presented by defendants' recital in the notice of appeal that the appeal is taken from the "Order Granting Motion to Modify Judgment," rather than the "modified" judgment itself.  This designation is frankly bewildering, since the motion to "modify" the "judgment" was unopposed and counsel for defendant appeared at the hearing only to ensure that an amendment to the proposed judgment, which plaintiffs' counsel had agreed to make, was in fact made.  Asked whether the documents submitted to the court for execution "meet with your approval," counsel replied, "Yes."  Plaintiffs suggests that this assent itself precludes any challenge to the judgment, but we think it plain that counsel was consenting only to the form of the judgment as an expression of the court's determination—not to its substance, with which defendants obviously took issue.  The fact remains that the notice of appeal fails to designate the judgment, instead purporting to appeal from the order authorizing the judgment to be entered.

We do not find this misstep fatal to the appeal.  Where a notice of appeal purports to target an order preliminary to judgment, appellate courts commonly preserve their jurisdiction by construing the notice to refer to the subsequently entered judgment.  (See, e.g., *Vesely v. Sager* (1971) 5 Cal.3d 153, 158, fn. 2 [notice designating order sustaining demurrer and granting motion to strike deemed to appeal from subsequently entered judgment of dismissal].)  " 'Whether the error in the notice of appeal was merely one in describing the order or judgment or whether it was caused by appellant's ignorance, the notice may without prejudice to respondent reasonably be interpreted to apply to an appealable order or judgment rendered before the appeal was noticed.' "  (*Hollister*

14

*Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 669, quoting *Vibert v. Berger* (1966) 64 Cal.2d 65, 70.)

We conclude that defendants' notice of appeal was sufficient to bring up the merits of the judgment for appellate review.

## II. *Defendants' Burden on Appeal*

Although defendants' brief is far from a model of clarity, we understand it to raise three claims of error: (1) The court relied on statutes first cited in a letter submitted by plaintiffs' counsel after trial, to which defendants were given insufficient opportunity to respond. (2) These statutes concerned powers of termination, and thus had no proper application here. (3) Insofar as the court's judgment depended on changed circumstances, there was no evidence to support it.

In presenting these arguments defendants offend a number of basic rules of appellate procedure and review. First and most fundamentally, "a party challenging a judgment has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) This requires (1) a record sufficient to establish the nature and relevant circumstances of the *actions by the trial court* which are challenged on appeal; (2) *argument and authority* establishing that these actions offended governing legal principles; and (3) a particularized demonstration, again based on an adequate record, that the error was *prejudicial* to the appellant.

Defendants have not brought up a transcript of the trial; therefore any assertions about the state of the evidence must fall on deaf ears. Nor have defendants, for the most part, offered a coherent argument in support of their claims of error. They have, in short, failed to shoulder their burden as appellants. We have nonetheless detected sufficient *suggestion* of error in their brief to conclude that such error as they do assert has either not been demonstrated to have occurred, or has not been shown to be prejudicial.

15

**III.** *Error*

    A. ***Reliance on Post-Trial Letter***

    Defendants assert that the court erred by relying upon authority and arguments first presented in a post-trial letter from plaintiffs' counsel to the court. The letter bears the date of November 9, 2009, which was nearly two years prior to trial, but both parties acknowledge that this was an error and that the letter was sent some time after trial.[8] In the letter, counsel for plaintiffs argued that statutes governing the duration of powers of termination (Civil Code sections 895.010 et seq.) furnished authority "[b]y analogy" for granting relief here. In its judgment, the trial court alluded to those statutes in concluding that "invalidation of these instruments, in order to remove whatever clouds upon title they may be causing, is appropriate."

    Defendants argue that the letter was in effect a supplemental trial brief, and as such was deficient in form, lacking in particular the proof of service required by Code of Civil Procedure sections 1012, 1013, and 1013a. Assuming this premise is sound, mere defects in form can rarely if ever justify a reversal on appeal. Rather we must "disregard any error . . . or defect, in the pleadings or proceedings which," in our opinion, "does not affect the substantial rights of the parties." (Code Civ. Proc., § 475.) We cannot set aside a judgment unless it "appear[s] from the record" that the error or defect complained of "was prejudicial," and that by reason thereof, the complaining party "sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed." (*Ibid*.)

---

    [8] Further illustrating the level of care seemingly exercised by both sides in this case is the statement in plaintiffs' brief that the letter was mailed "[a]t some point after the trial date, October 17, 2011." In fact trial occurred on *August* 17, 2011. No relevant event occurred on October 17.

Defendants make little effort to demonstrate that plaintiffs' post-trial letter inflicted any prejudice on them. They only assert that they were "never formally afforded the opportunity to respond" to it. The pregnant use of the qualifier "formally" grounds an inference that defendants in fact received the letter, which bears the notation, "Copy: Reid Schantz," indicating—according to familiar conventions of business correspondence—that a copy of the letter was sent to defendants' attorney. Beyond that the record is entirely silent with respect to the extent of defendants' opportunity to respond. Even the timing cannot be inferred because the date of the letter is unknown.

Plaintiffs' counsel asserts that the foregoing notation is sufficient to raise "the presumption of receipt under Evidence Code §641." This contention is specious; the presumption would require evidence, entirely lacking here, that the letter was "correctly addressed and properly mailed." (Evid. Code, § 641.) Still, an *inference* that defendants' counsel received the letter seems warranted by the facts that the letter alludes to transmission, that counsel has never denied receipt, and that he objects only to the form of the letter and the absence of a "formal" opportunity to respond.

In any event all defendants have shown is that the court adopted a legal rationale that was submitted to it in an irregular, and perhaps improper, form. It is impossible to say that the irregularities had any effect on the outcome. As will appear below, we are confident that they did not.

### B. Reliance on Inapposite Statutes

Defendants suggest that the power-of-termination statutes had no bearing on the issues here. We agree that the statutes' pertinence is at best extremely attenuated. They address situations where the grantor of a fee simple estate has reserved the power to terminate the estate upon the occurrence of a specified condition. (Civ. Code, § 885.010, subd. (a)(1).) This action, in contrast, concerns servitudes imposed and assumed by

17

adjoining property owners by mutual assent.  We see no particular resemblance between any of these servitudes and a power of termination.

However, the mere fact that the court relied on dubious authority cannot by itself lead to reversal.  An appellate court "review[s] the judgment, not the reasoning of the court below.  [Citation.]  '. . . [A] ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason.  If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion.  [Citations.]' (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568.)" (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 769-770.)  "Two theories seem to be involved here: *first*, that the appellate court reviews the action of the lower court and not the reasons for its action; *second*, that there can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." (9 Witkin, *supra*, Appeal, § 346, p. 397.)

As we read the judgment, the trial court only cited the power-of-termination statutes as a guide to what might constitute a reasonable time for defendants to exercise whatever rights they had under the agreements at issue here.  As discussed in greater detail below, we believe the agreements could be reasonably understood to create interests that were both conditional and limited in duration.  It was apparently in reference to that aspect of the controversy that the court viewed the statutes governing powers of termination as possessing some analogical force.  While we find the court's reliance on them somewhat questionable, we cannot say that it inflicted any prejudice on defendants, because we think the judgment is sustained on the grounds set forth below.

## C. *Parking Agreement*

We find ample grounds on the face of the parking agreement to conclude that it was unenforceable and subject to cancellation insofar as it might affect plaintiffs or their

18

title.  The language of the agreement indicates that the obligations it created were explicitly predicated on a condition that never came to pass, that they were expressly limited in duration, and that they were not intended to bind Gravenhorst/Stauffer's successors in interest, including plaintiffs.

The chief right conferred on defendants by the parking agreement—indeed the only one discussed by the parties—was a right to purchase four parking spaces on neighboring properties.  Although neither side mentions the fact, the agreement also granted defendants a right to purchase a 400 square foot "recreational area," sometimes apparently referred to as a "sitting yard."  The agreement plainly stated, however, that these rights would only come into being "[i]n the event the County of Santa Cruz imposed additional parking requirements and a recreational area requirement . . . ."  Defendants conceded below that as of the time of trial, the county "ha[d] not required . . . [defendants to] obtain the additional 4 parking spaces contemplated in the Use Agreement."

It is of course the rule that an interest depending on a condition passes in or out of existence in accordance with its conditional nature.  (See 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 382, pp. 446-447.)  Thus the right to purchase parking and recreational spaces here never came into existence.  Defendants implied, however, that it might yet do so, stating that "should the County impose the actual parking requirements," they were "relying on the terms of the Use Agreement" to satisfy those requirements and "not lose the commercial use of their property."  They thus asserted a right that was in effect *perpetual*.  But the agreement itself squarely contradicts such a claim, stating that the right was to be a "temporary" one lasting only so long as the existing "partial residential use" of the property, which defendants intended to end by converting the property entirely to commercial use.  This at any rate is how we read the

19

language set forth in the margin.[9] Defendants have offered no alternative reading; indeed the parties have scarcely troubled themselves with the language of the agreements at all. But the agreement explicitly contemplated that the rights granted would be of limited duration, which must be taken to mean that defendants were granted a reasonable time within which to exercise it, at the conclusion of which the obligation would be extinguished whether they had done so or not. (See Civ. Code, § 1657 ["If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."].)

The agreement also contains intrinsic indications that the time contemplated by the parties was well short of the 25 years that had elapsed at trial. It provided that payment for the parking and recreational spaces—both when purchased by defendants, and when sold back to Gravenhorst/Stauffer—would be made by adding the purchase price to, or subtracting it from, the balance of an existing loan between the parties. It appears highly unlikely that this payment mechanism would remain available after a sale of the burdened property by Gravenhorst/Stauffer, because the purchase price would then be payable to their successors, who could not be expected to assume the loan in question. Certainly this payment mechanism would cease to exist when the loan was paid off. Although the term of the loan is not unmistakably disclosed by the record, the agreement refers to "amortization over a 20-year period." The failure to provide for an alternative payment

_____

[9] "It is the intention and agreement of the parties that the acquisition of the adjacent properties from Seller will be a *temporary one only* to meet the residential requirements imposed by the County of Santa Cruz. *Buyer intends to convert the entire improvements at 4630 West Walnut to commercial use.* To implement the foregoing Buyer and Seller agree that Buyer has option [*sic*] to construct a second story decking on the rear and/or on the side of the subject property to meet the recreational space requirements of the County of Santa Cruz, and by doing so discontinue the requirement for the 400 Sq. Ft. parcel. *When that is accomplished, Buyer shall sell back to Seller and Seller shall purchase from Buyer the said 400 Sq. Ft. property at the original $6,000.00 price and the parking area for the sum of $2,000.00 per space.*" (Italics added.)

20

mechanism strongly suggests an intention that any purchase and resale would be completed at least that soon.

The parking agreement also expressly reserved to Gravenhorst/Stauffer the power to determine the *location* of the spaces to be sold. It provided that they could be situated on any of the "adjacent properties owned by Seller, with the location of such to be determined by Seller," provided that the locations (1) conformed to county requirements, and (2) were within 80 feet of defendants' property. The agreement provided no mechanism for determining the location of these spaces after the potentially burdened properties had come under separate ownership, as had occurred by the time this matter arose. For defendants to now exercise the purchase rights contemplated by the agreement, someone would have to determine which of their neighbors would provide space, and how much, and where. We doubt that any private actor could successfully claim the power to make such a selection, or that any court would undertake to do so. In any event, the agreement's failure to provide for the selection of locations after Gravenhorst/Stauffer no longer owned the properties is more evidence that the obligation to provide parking and recreational space was personal to them and that if defendants were to exercise the correlative right at all, they had to do so before the promisors divested themselves of the means to perform.

That the obligation to provide parking and recreational space was personal to Gravenhorst/Stauffer is also readily inferred from the agreement's complete failure to provide otherwise. This failure cannot be attributed to mere oversight, because the Use Agreement pointedly declares another obligation, not at issue here, binding on the parties' successors in title. Paragraph 6 states that the occurrence of specified conditions will cause an "existing stairway easement" benefiting defendants' property to undergo "diminishment," such that it becomes "only a fire easement," to be "appropriately marked and signed" as such. The next paragraph states, "This agreement for modification of the

21

easement shall . . . run with the land and be binding upon the parties hereto, their successors, or assigns." There is no similar recital with respect to any other provision of the agreement, including the right to purchase additional parking and recreational spaces. The use of language of appurtenance in reference to the stairway easement, but *not* in reference to the parking/recreational spaces, supports an inference that the latter obligation was intended to bind only Gravenhorst/Stauffer.

So far as this record shows, the trial court was bound to reach the conclusion it did with respect to the parking agreement. That agreement plainly did not grant defendants a perpetual right to purchase space on neighboring properties. To the extent it burdened those properties at all—a doubtful proposition with respect to the rights at issue here— the right could readily be found to have become unenforceable by the time the matter was adjudicated. The court acted quite properly in expunging from plaintiffs' title whatever shadow remained of that erstwhile right.

### D. Road Agreement

The road agreement presents a more difficult case than the parking agreement because we see nothing on its face rendering it unenforceable against plaintiffs. It purports to create a number of mutually binding covenants, explicitly running with the land, concerning the use, maintenance, repair, and improvement of a "right of way" that traverses or touches upon plaintiffs' and defendants' property, as well as the property of the neighboring Bermans, who are not parties here.[10] Nothing in the record affirmatively demonstrates that those mutual obligations have become unenforceable. The absence of a trial record, however, makes it impossible to say that the trial court erred in so finding.

---

[10] The road agreement states, "The Parties agree that the rights and responsibilities contained in the Agreement shall constitute covenants running with the land," and, "The parties hereto further agree to obligate themselves, their heirs. personal representatives, successors and assigns to maintain and improve said road in accordance with the terms and conditions of this agreement."

22

Both parties agree that the underlying purpose of the road agreement was to fulfill a condition imposed by county planners on the development of defendants' property. Beyond that its intended effect—particularly on the property rights of the parties—is far from clear. It does not plainly *create* a right of way, but rather declares certain mutual rights and obligations with respect to a right-of-way that may or may not already exist. The paradigmatic term "grant" nowhere appears. (See Civ. Code, § 1092 ["grant of an estate . . . may be made in substance" by stating, " 'I, A B, grant to CD' " the described property]; *Klamath Land & Cattle Co. v. Roemer* (1970) 12 Cal.App.3d 613, 618 ["The essential of such a [grant] deed has long been held to be the word 'grant' [citation] and it appears that in California this word has been applicable to the transfer of *all* estates in real property, and not solely estates in fee simple, since sometime prior to 1845."].) Of course we are long past the days when the law depended on ritual incantations, and a conveyance may be effective despite failure to use the word "grant." (See *Carman v. Athearn* (1947) 77 Cal.App.2d 585, 596 ["No precise words are necessary to constitute a present conveyance."].) The dispositive question is whether the words used "are sufficient to show an intention to pass a present title." (*Id.* at p. 597.) However we see no other language in the agreement—or anywhere else in the record—establishing such an intent. [11]

---

[11] "An instrument creating an easement is subject to the same rules of construction applicable to deeds and is interpreted in the same manner as a contract. [¶] . . . . The conveyance is interpreted in the first instance by the language of the document. When the intent of the parties can be derived from the plain meaning of the words used in the deed, the court should not rely on the statutory rules of construction. . . . [¶] . . . When the document creating the easement is ambiguous, the court looks to the surrounding circumstances, the relationship between the parties, the properties, and the nature and purpose of the easement in order to establish the intention of the parties. The cardinal rule of interpretation is to ascertain and enforce the intentions of both the grantor and the grantee." (6 Miller & Starr (3d ed.) Cal. Real Estate, § 15:16, at pp. 62–63 (fns. omitted); see Civ. Code, § 806 ["The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was

The agreement opens with a recital that it "pertains to that right of way described as Parcel Four in the attached exhibit." This language suggests the agreement then proceeds to declare rights and obligations concerning the use, repair, governance, maintenance, and improvement, of the right of way. The ninth paragraph clearly refers to a right of way that already exists for the benefit of defendants' parcel, stating that vehicles and pedestrians may "[c]urrently" enter a "recorded" right of way meeting "the parking and circulation necessities for the existing 4630 West Walnut Building."[12] The tenth paragraph then recites the "*intention* of May Gravenhorst Stauffer or her assigns to *further develop the existing vehicle and pedestrian right of way* to enter off Porter Street to run through [other parcels] and then cut out of [a specified parcel] to ultimately exit into West Walnut"—a description that appears to match "Parcel 4." Adding yet more uncertainty is a statement that "vehicle, pedestrian, parking and circulation arrangements shall be *planned and agreed* to in writing between each parcel mentioned above"— language suggesting only an agreement to agree, a type of contract generally viewed as illusory and unenforceable.

The absence of a trial transcript leaves a factual vacuum about the actual circumstances in which the agreements were entered, but both sides asserted in their trial briefs that they were intended to satisfy requirements of county planners.[13] Plaintiffs

acquired."]; Civ.Code, § 1066 ["Grants are to be interpreted in like manner with contracts in general"].)

[12] This was apparently the "Liles easement" which counsel mentioned at the hearing on the motion to modify the judgment, and which both attorneys agreed was not affected by the present judgment.

[13] Attached to defendants' trial brief were planning documents stating that "A joint parking and circulation agreement shall be established between the following parcels: 30-201-11, 25, 34, 36, and 37"—i.e., plaintiffs' and defendants' parcels, plus the parcel(s) of the Bermans.

24

went further, asserting that the parking agreement, and by extension both agreements, were a "hoax" intended solely to satisfy planning requirements and not, inferentially, to create genuine property rights. Plaintiffs further asserted in their brief "[t]here never has been a 'road' in the parcels described." Defendants did not, so far as this record shows, take issue with this assertion.

It thus appears that the road agreement spells out the parties' rights and obligations with respect to maintenance of a posited roadway which may or may not be entirely hypothetical. The rights and obligations are extremely ambiguous and may even be illusory insofar as the agreement anticipates future agreement among the owners. Given these circumstances the record before us affords no basis to say that the trial court was compelled to find that the road agreement created a valid and subsisting interest in defendants burdening the neighboring properties.

Nor does the record permit us to say that the court could not find such a material change in conditions as to justify the extinguishment of whatever beneficial interest the road agreement might otherwise vest in defendants. In their trial brief and again on appeal, defendants concede that a servitude or similar burden on land may be rendered unenforceable by "a material change in conditions to the extent that the original purpose for the restriction becomes obsolete." In fact the rule is somewhat broader than this. In *Wolff v. Fallon* (1955) 44 Cal.2d 695, 696-697, the court wrote that the plaintiffs were entitled to relief from a restriction limiting their property to residential use where the trial court found the property no longer suitable for residential use and that enforcement of the restriction "would be inequitable and oppressive and would harass plaintiff *without benefiting the adjoining owners*." (Italics added; see also *Hirsch v. Hancock* (1959) 173 Cal.App.2d 745, 758-759 [rejecting as "groundless," in light of *Wolff*, contention that "the termination of restrictions by judicial decree is justified only when their original purpose has become obsolete"]; *Bolotin v. Rindge* (1964) 230 Cal.App.2d 741, 744

25

[invalidation of restriction reversed where trial court made "no finding that the purposes of the restrictions have become obsolete, *or that the enforcement of the restrictions on the plaintiffs' property will no longer benefit the defendants*"] italics added.)

The question of changed conditions was clearly tendered by the pleadings and addressed by the trial court. Plaintiffs alleged in their complaint that the agreements "endow[ed] defendants with no assertable rights" because they contemplated the devotion of defendants' parcel to "the conversion of a single family dwelling into commercial offices with interim use of two apartments," and "rested upon specific conditions which never took place." Similarly they asserted in their trial brief that the agreements "address[ed] an entirely conditional set of circumstances which never took place." The trial court wrote in its judgment that "[o]ver the . . . twenty-five years" since the agreements had been recorded, "none of the events which were contemplated with the creation of these agreements have taken place." The court also stated that "circumstances have changed in relationship to the Santa Cruz County Ordinances adopted in 1995 and 2009."

Defendants have failed to show that these facts, or the rationales they imply, were not sufficient to sustain the judgment. Defendants merely assert that "there is no written evidence whatsoever before the Court that circumstances had changed in relationship to the Santa Cruz Ordinances adopted in 1995 and 2009." But this denial of the presence of "written" evidence is pregnant with the possibility, and indeed may be understood as an implicit admission, that the trial court received other evidence—such as oral testimony— of such a change in circumstances. In any event an appellate reversal cannot be predicated on claimed deficiencies in the evidence where the evidence before the trial court has not been brought up on appeal and affirmatively shown to be legally insufficient. " 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*,

26

and *show how and why it is insufficient*. [Citation.]' (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 208, italics added.)" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) Obviously it is impossible to accomplish this task when the relevant evidence is absent from the record.

In short, the present record will not allow us to say that the trial court erred in finding the road agreement, along with the parking agreement, unenforceable. If the court erred, it was incumbent upon defendants to present a sufficient record—and sufficient legal argument—to establish as much. They have failed to do so.

### DISPOSITION

The judgment is affirmed.

 

_____
RUSHING, P.J.


WE CONCUR:


_____
PREMO, J.


_____
ELIA, J.

27